**PART I: ADMINISTRATIVE FILING SHELL (FORM JS 44 & CM/ECF DESIGNATION COMPLIANCE)**

**UNITED STATES DISTRICT COURT** for the Southern District of Ohio, Eastern Division (Columbus)

**CORY A. HAYDOCY, ESQ.**, individually,

**AMY N. HAYDOCY**, individually,

As Husband and Wife and as a **Unified Marital Estate and Independent Plaintiffs**,

and on behalf of all similarly situated citizens and public beneficiaries,

*Plaintiffs*,

v.

**OHIO PUBLIC EMPLOYEES RETIREMENT SYSTEM (OPERS)**, and

**OHIO PUBLIC EMPLOYEES DEFERRED COMPENSATION PROGRAM (ODC)**,

*Defendants*.

*Plaintiff(s)* **-v- OHIO PUBLIC EMPLOYEES RETIREMENT SYSTEM (OPERS),** and

**OHIO PUBLIC EMPLOYEES DEFERRED COMPENSATION PROGRAM (ODC),**

*Defendant(s)* **Case No.:** 2:26-cv-816

**Jury Trial Demand:** [X] Yes

**I. THE PARTIES TO THIS COMPLAINT**

**A. The Plaintiff(s):**

**Primary Standing of the Individual Plaintiffs:** Plaintiffs Cory A. Haydocy, Esq. and Amy N. Haydocy bring this action primarily in their individual capacities to vindicate their distinct, vested property rights and  interests, accrued deferred compensation, and common-law spoliation remedies. The primary objective of this litigation is the immediate adjudication of the Haydocy

marital estate's individual claims, which are fully severed and maintain an independent litigation track. Only as a secondary and conditional matter, should the Court determine that good cause is shown and that the systemic nature of the Defendants' un-promulgated protocol demands broad relief, do Plaintiffs request that the Court consider class certification and public interest designation.

**Primary Individual Track and Conditional Class Adjudication:**

The operational priority of this file is the clinical resolution of the constitutional property deprivations and tortious conversions targeting the singular household unit of Cory A. and Amy N. Haydocy. Adjudication of these individual claims shall proceed with full weight regardless of class determinations. In the alternative event that the Court identifies a specific judicial efficiency in expanding the scope to a statewide Class, Plaintiffs stand prepared to transition into representative roles, but such a determination remains a secondary matter subject to a showing of good cause and the Court's absolute discretion.

Plaintiffs' primary objective is the clinical deployment of this file and the immediate return of their captured capital. Should the Court determine that the systemic, plan-wide nature of the Defendants' un-promulgated protocol demands broad class-wide remedies, Plaintiffs stand fully prepared to transition into the roles of Putative Class Representatives and Co-Counsel alongside independent Lead Counsel chosen by the judicature. Conversely, if the Court elects to narrow the focus to the immediate marital injury, the extensive forensic matrix, self-authenticating Civ.R. 36 admissions, and severe spoliation elements stand independently verified, establishing an unassailable individual entitlement to summary judgment, direct federal equity, and the immediate deployment of a technical Special Master under Rule 53.

1

Furthermore, Plaintiffs note that this litigation, given its complex forensic nature and multi-layered administrative matrix, provides a valuable opportunity for young attorneys within the Southern District of Ohio to gain significant experience in federal civil rights and racketeering practice.

- **Class Representative Plaintiffs:** Cory A. Haydocy, Esq. & Amy Haydocy

- **Lead Counsel for Plaintiffs:** Cory A. Haydocy, Esq. (Bar No. 0089694)

- **Law Firm / Firm Infrastructure:** Haydocy Law Office LLC

- **Address:** 6868 Bowerman St. E, Worthington, Ohio 43085

- **County:** Franklin

- **Telephone Number:** 614-284-4250

- **E-Mail Address:** cory@haydocylaw.com

**B. The Defendant(s)**

- **Defendant No. 1:** Ohio Public Employees Retirement System (OPERS)

- **Capacity:** [X] Official capacity

- **Defendant No. 2:** Ohio Public Employees Deferred Compensation Program (ODC)

- **Capacity:** [X] Official capacity

- Personal Capacity: Chris Mabe, Lauren Gresh, Karen Carragher, Maryellen O'Shaughnessy, Nikisha Wilson

**II. BASIS FOR JURISDICTION**

- **Type of Claim:** [X] State or local officials acting under color of state law (42 U.S.C. § 1983).

2

- **Constitutional/Statutory Rights Violated:** Fourteenth Amendment Due Process Clause; Fourteenth Amendment Equal Protection Clause; 18 U.S.C. § 1962(c) (Civil RICO Enterprise pattern of mail and wire fraud to conceal public record spoliation and sequester consumer assets). Supplemental jurisdiction over integrated state-law torts is invoked pursuant to 28 U.S.C. § 1367.

## III. STATEMENT OF CLAIM

⚠️ **CM/ECF ENTRY: SEE ATTACHED COMPLAINT ADDENDUM AND EVIDENCE CODES ATTACHED HERETO AND INCORPORATED HEREIN.**

**PART II:  COMPLAINT ADDENDUM**

**IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO**

**EASTERN DIVISION (COLUMBUS)**

**CORY A. HAYDOCY, ESQ.**, individually,

**AMY N. HAYDOCY**, individually,

As Husband and Wife and as a **Unified Marital Estate and Independent Plaintiffs**,

and on behalf of all similarly situated citizens and public beneficiaries,

*Plaintiffs*,

**vs. OHIO PUBLIC EMPLOYEES RETIREMENT SYSTEM (OPERS),** c/o Statutory Agent

/ Executive Director

277 East Town Street

Columbus, Ohio 43215,

and

3

**OHIO PUBLIC EMPLOYEES DEFERRED COMPENSATION PROGRAM (ODC),** c/o

Statutory Agent / Executive Director

257 East Town Street

Columbus, Ohio 43215,

*Defendants*.

**Case No.:** 2:26-cv-_____

**District Judge:** _____

**Magistrate Judge:** _____

**COMPLAINT FOR SYSTEMIC CIVIL RIGHTS VIOLATIONS, RACKETEERING, FRAUD ON THE TRIBUNAL, STRUCTURAL PUBLIC RECORD SPOLIATION, AND ADMINISTRATIVE DERELECTION OF DUTY**

**NOW COMES** Plaintiff, Cory A. Haydocy, Esq., appearing primarily in his individual capacity alongside Amy N. Haydocy as a unified marital estate. The primary purpose of this action is to redress the specific constitutional property deprivations and tortious conversions uniquely targeting Plaintiffs' household capital. As a secondary and conditional matter, should the Court find that good cause exists to address the broader systemic implications of the Defendants' conduct, Plaintiff moves for the designation of this matter as a class action on behalf of similarly situated public beneficiaries.

To unyieldingly vindicate the broader public interest, protect his family's vested property entitlements, and strictly insulate this collective action from the structural, dual-capacity conflicts of interest identified under *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997),

4

Plaintiff initiates this action as a bifurcated advocacy unit. Plaintiff serves as the sophisticated Class Representative and forensic architect driving the evidentiary inventory, while designating that the primary operational and administrative workload under Fed. R. Civ. P. 23(g) be assigned to court-approved, independent Lead Class Counsel upon survival of any motion to dismiss and formal class certification.

If the Court elects to narrow the focus to this immediate marital injury, the extensive forensic matrix, self-authenticating Civ.R. 36 admissions, and severe spoliation elements stand independently verified—establishing an unassailable individual entitlement to summary judgment, direct federal equity, and the immediate appointment of a technical Special Master under Rule 53.

Plaintiffs are completely agnostic to litigation or corporate ego. Their immediate, primary objective is the clinical deployment of this forensic file and the immediate return of their captured marital capital. Accordingly, this action is deliberately brought on a **strict dual-track basis**:

- **Track I: Standalone Individual Marital Adjudication (Primary):** Plaintiffs proceed primarily on their independent, individual claims for constitutional property deprivations, tortious conversion, and intentional evidence spoliation uniquely targeting the Haydocy household unit. The extensive forensic matrix, self-authenticating Civ.R. 36 admissions of record destruction, and the $50,000 un-notarized transaction log establish an **immediate, unassailable individual entitlement to summary judgment**, direct federal equity, and the appointment of a technical Special Master under Rule 53, entirely independent of class certification.

- **Track II: Alternative Putative Class Action (Secondary):** In the alternative event—and only to the extent that it does not delay or prejudice the immediate adjudication of the individual marital estate's property rights—Plaintiffs stand fully prepared to transition into the roles of Putative Class Representatives alongside independent, court-approved Lead Class Counsel under Rule 23(g) to rectify the systemic deprivation of substantive and procedural due process enforced against thousands of Ohio citizens.

For their Complaint against Defendants Ohio Public Employees Retirement System ("OPERS") and Ohio Public Employees Deferred Compensation Program ("ODC"), Plaintiffs respectfully state and alleges as follows:

## I. NATURE OF THE ACTION

1. Plaintiffs bring this action, appearing through counsel as the class representative, to expose, dismantle, and remedy a highly coordinated, multi-layered civil rights conspiracy, operational concealment, and racketeering pattern weaponized by state-level administrative actors to systematically sequester private consumer capital, destroy public electronic tracking logs under a strict preservation obligation, and insulate institutional malfeasance from federal and state judicial review.

2. Operating under the color of state law, Defendants have unconstitutionally erected an extra-statutory, un-promulgated, and unpublished "Notary Policy." This non-statutory gauntlet is utilized exclusively as an arbitrary administrative tool of attrition to gatekeep, delay, and deny the non-discretionary ministerial transfer of vested funds belonging to tens of thousands of Ohio citizens represented in this putative class. See *Knick v. Township of Scott*, 139 S. Ct. 2162, 2170 (2019) (holding property owners possess a constitutional right to immediate federal equity

6

remedies the moment a state actor deprives them of a vested interest under color of law, regardless of ongoing state-court options).

3. To shield this illicit architecture from scrutiny, Defendants have actively engaged in structural fraud on state tribunals through a systematic policy of data-sanitization and material misrepresentations of fact to state courts, including the documented destruction of electronic financial transaction logs and the calculated excision of relevant evidence submitted to the Supreme Court of Ohio.

4. The Three-Part Adkins Test for an Adverse Inference and Omni-Spoliation Admissions: When a state administrative apparatus deliberately purges its digital trails and contracts, it satisfies the strict three-prong standard for severe evidentiary sanctions. Under the controlling framework established by the United States Court of Appeals for the Sixth Circuit in *Adkins v. Wolever*, 692 F.3d 499 (2012), a federal court possesses absolute inherent authority to levy an adverse inference instruction against a party upon proving: (1) an obligation to preserve the evidence existed at the time of destruction; (2) the records were destroyed with a culpable state of mind; and (3) the destroyed evidence was relevant to the underlying claims.

    a. Prong 1: The Absolute Duty and Power Imbalance: First, Defendants OPERS and ODC maintained an ironclad statutory and fiduciary obligation to preserve the entire file. By virtue of their trust positions as state benefit administrators, Defendants wielded exclusive possession over the database logs and the physical contract documents. This profound imbalance of power forces the public beneficiary to rely completely on the good faith of the fiduciary, elevating the non-discretionary preservation of these tracking records to a mandatory statutory trigger.

7

b. Prong 2: The Culpable State of Mind and Executive Mens Rea: Second, the requisite *mens rea* and institutional consciousness of guilt stand irretrievably exposed by the Defendants' own administrative admissions. ODC has formally confessed to physically destroying primary contract instruments. The intentional character of this data-sanitization is further crystallized by the communications of Executive Director Gresh, who specifically designated the Relator as an adversarial challenger rather than a public beneficiary—forensically proving that the administrative enterprise knowingly purged the foundational record *after* the crystallization of the precise dispute establishing their underlying legal liability.

c. Prong 3: Relevance and the Omni-Spoliation Fallacy: Third, the destroyed evidence is not merely relevant; it is the dispositive anchor of the litigation. ODC admits it received the binding contract document, yet asserts the illogical legal narrative that its physical destruction does not matter. This defensive posture is a structural fallacy; the destroyed records represent the literal parameters of the state's financial liability. Because Defendants knew the evidence was fatal to their containment protocol and willfully permitted its loss, the *Adkins* metrics are completely fulfilled, mandating an absolute adverse inference that the purged files completely validate Plaintiff's calculations of the fraud.

5. The Tactical Desertion of State Authority: The profound systemic magnitude of this enterprise is further punctuated by the abrupt, pre-expiration departure of the state's Chief Law Enforcement Officer. Synchronized with the crystallization of formal admissions concerning institutional record spoliation, David Yost executed a sudden, mid-litigation abdication of his constitutional post on June 7, 2026—a full seven months before his term's conclusion. This

8

calculated retreat into the private sector generates an absolute executive void, serving as an unambiguous forensic marker of administrative flight intended to circumvent personal liability under 42 U.S.C. § 1983. See *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (establishing that an unprovoked, rapid withdrawal from an active enforcement perimeter constitutes the primary circumstantial indicator of an underlying consciousness of guilt).

6. Plaintiff brings this action pursuant to 42 U.S.C. § 1983, 42 U.S.C. § 1985, and the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961 *et seq.*, to vindicate the constitutional rights of Ohio public beneficiaries and to secure the immediate appointment of a Federal Special Master with plenary operational authority over the administrative recordkeeping infrastructures of OPERS and ODC.

## II. JURISDICTION AND VENUE

1. This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), as this matter arises under the Constitution and laws of the United States, specifically 42 U.S.C. §§ 1983 and 1985, the Fourteenth Amendment to the United States Constitution, and 18 U.S.C. § 1964 (RICO civil remedies). See *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 725 (1966) (confirming federal courts retain total power to adjudicate ancillary state claims if they derive from a single common nucleus of operative facts).

2. Supplemental jurisdiction over Plaintiff's integrated state law claims is properly exercised pursuant to 28 U.S.C. § 1367, as the state law claims are so related to the federal civil rights and RICO claims that they form part of the same case or controversy and arise from a common nucleus of operative facts. *Id*.

3. Venue is proper in the United States District Court for the Southern District of Ohio, Eastern Division, pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2). Defendants maintain their principal

9

corporate headquarters in Columbus, Ohio, and a substantial part of the events, omissions, record spoliations, and unconstitutional fund sequestrations giving rise to these claims occurred directly within this judicial district. See 28 U.S.C. § 1391(b)(2) and *Uffner v. La Reunion Francaise, S.A.*, 244 F.3d 38, 42 (1st Cir. 2001) (confirming venue is perfect where the physical or digital spoliation and capital conversions occurred).

## III. THE PARTIES

1. The Plaintiffs and Joint Marital Standing: plaintiffs Cory A. Haydocy, Esq. and Amy N. Haydocy are married citizens of the United States residing in Worthington, Franklin County, Ohio. They bring this action primarily in their individual capacities as an inseparable, unified marital estate. Plaintiffs assert absolute, standalone Article III standing to vindicate their distinct, vested property rights and private assets tortiously targeted for administrative sequestration and conversion by the Defendants. This individual marital track stands fully mature, severed, and operational; it is completely independent of, and shall not be contingent upon or delayed by, future class certification determinations under Federal Rule of Civil Procedure 23.

   a. Status of Plaintiff Amy N. Haydocy: Plaintiff Amy N. Haydocy is a dedicated public servant, currently employed as a third-grade public school teacher within the State of Ohio, and is a direct public beneficiary of the state fund systems administered by the Defendants.

   b. Background and Institutional Anchoring of Plaintiff Cory A. Haydocy, Esq.: Plaintiff Cory A. Haydocy, Esq. is a member in good standing of the Ohio Bar, formally admitted to practice before the Bar of this Court, with 13 years of distinguished experience as a licensed attorney. Born and raised in the Columbus, Ohio metropolitan area, Mr. Haydocy graduated with honors from Dublin Coffman High School before graduating magna cum

10

laude from the University of Dayton with a Bachelor of Arts degree in Political Science. Leveraging this rigorous academic foundation, Mr. Haydocy has developed a highly specialized background as a corporate litigation manager and senior state investigative attorney, trained directly by the government to detect, unmask, and prosecute administrative fraud and structural evidence spoliation. The undersigned has discharged his professional oaths across consecutive, high-level fiduciary and regulatory appointments:

- Legal Counsel for the Ohio Auditor of State (2012–2015);

- Senior Investigative Attorney for the Ohio Department of Education (2015–2019);

- Executive Director of a State Regulatory Commission (2019–2023), a post he held until his voluntary departure from state service on December 29, 2023, to orchestrate this asset recovery action; and

- Chair of the Ohio State Bar Association's Ethics Committee, entering private practice and executing leadership over the state's ethical parameters before formally resigning from this prestigious post in May 2025 during the progression of this multi-front litigation. This strategic resignation was executed to strictly insulate the proposed Class and the individual marital estate from any appearance of a dual-capacity conflict of interest, ensuring an uncompromised, unassailable posture while aggressively confronting systemic administrative corruption within the state's retirement networks.

c. Alternative Bifurcated Class Representation: To satisfy the strictures of *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997), Plaintiffs record a secondary, alternative

11

operational track: should the Court determine that the plan-wide nature of the Defendants' un-promulgated protocol demands broad remedies, Plaintiffs stand fully prepared to serve as sophisticated named Putative Class Representatives to drive the evidentiary matrix, while explicitly designating that primary administrative class workload under Rule 23(g) be assigned to court-approved, heavily capitalized, independent Lead Class Counsel.

2. The Statutory Corporate Defendants:

    a.  Defendant Ohio Public Employees Retirement System ("OPERS"): OPERS is a state-mandated administrative entity established pursuant to Chapter 145 of the Ohio Revised Code, strictly bound by a non-discretionary fiduciary mandate to preserve and accurately convey the capital contributions of Ohio's public beneficiaries.

    b.  Defendant Ohio Public Employees Deferred Compensation Program ("ODC"): Pursuant to explicit legislative mandates, ODC is a separate, autonomous administrative entity created under Ohio R.C. 148.02, completely separate from OPERS corporate infrastructure. Under R.C. 148.04, ODC possesses standalone, non-delegable authority to independently contract and manage qualified investment funds under Section 457 of the Internal Revenue Code. ODC is fully and independently accountable for its own distinct data-retention failures, contract breaches, and structural conversion actions.

3. Named Individual Defendants (Personal Capacities)

Plaintiffs explicitly name the following individual defendants in their personal, individual capacities pursuant to 42 U.S.C. § 1983 and 18 U.S.C. § 1962(c). When state officials engage in intentional, bad-faith constitutional deprivations or actively direct a corrupt association-in-fact enterprise, any protective veil of statutory or qualified immunity dissolves:

a. **Defendant LAUREN GRESH:** Named in her personal capacity as Executive Director of ODC, who exercised direct executive control over the retention of Plaintiffs' vested files, personally authorized the non-retention and physical spoliation of core transaction records, and/or actively coordinated an administrative referring loop designed to trap the beneficiary in an engineered information deficit.

b. **Defendant KAREN CARRAHER:** Named in her personal capacity as Executive Director of OPERS, who architected and enforced the extra-statutory, unpublished identity-verification gauntlet mid-stream, and/or actively directed the structural configuration of the online portal to intentionally obstruct a beneficiary's retrieval of dispositive compliance correspondence and evidence of administrative default.

c. **Defendant CHRIS MABE:** Named in his personal capacity as Chairman of OPERS and ODC and Governing Board member, who affirmatively ratified the predatory infrastructure of economic attrition to systematically sequester high-value beneficiary capital pools, generating unauthorized corporate-adjacent float reserves; and upon receiving definitive forensic notice of this illicit enterprise, executed a calculated, bad-faith cycle of delay and denial to shield the actions of the administrative spoliators—the executive architect and purported head of the enterprise.

d. **Defendant NIKISHA WILSON:** Named in her personal capacity as Supervisor within the Franklin County Clerk of Courts, who acted as an active litigation concealment partner by systematically purging, scrubbing, and excising critical public tracking instruments (including the January 16, 2025 "Lulling Letter") from the index certified to the Ohio Supreme Court.

13

e. **Unidentified Co-Conspirators and Target Class:** Because OPERS and ODC have deployed bad-faith motions to stay and deleted primary relational databases, the full scope, exact technical division, and exhaustive roster of individual co-conspirators complicit in this data-manipulation remain currently obscured. This network specifically encompasses Franklin County Clerk of Courts Maryellen O'Shaughnessy, additional adjacent technology vendors, IT compliance units, and subordinate supervisory personnel who actively executed or facilitated the digital data-wiping actions and database erasures. Plaintiffs explicitly reserve the right under federal practice to amend these pleadings to name each individual actor in their personal capacity the moment compulsory federal discovery and the Federal Special Master unseal the suppressed communication logs, internal manuals, and metadata strings.

## IV. CHRONOLOGICAL SPECIFICATION OF THE ADMINISTRATIVE CONSPIRACY

1. Plaintiffs, by and through counsel, incorporate the following chronological ledger of objective data points, formal discoveries, and official state-actor defaults across multiple state tribunals to establish the continuous pattern of racketeering, spoliation, and constitutional deprivation:

a. December 29, 2023: Plaintiff, Cory A. Haydocy, Esq., executes a voluntary departure and explicit separation from Ohio state service. This operative date triggers the strict, non-discretionary 60-day statutory vesting and distribution window mandated by R.C. 145.40 and R.C. 148.04, initializing Defendants' absolute, non-discretionary ministerial obligation to maintain account integrity and prepare for capital conveyance (**Fed. Exh. 1**).

b. February 26, 2024: Plaintiff fully executes and delivers a completed, unconditioned fund-transfer and rollover directive application. This instrument contains absolute

14

commands to migrate Plaintiffs vested, private capital out of the state-controlled low-interest repository, explicitly waiving all secondary verification float (**Fed. Exh. 2; State Exh. A-1**).

c.  February 27, 2024: The statutory 60-day administrative window for fund retention expires. By operation of law, legal title to the sequestered assets vests irrevocably and uniquely in the Plaintiff. See ORC 145.40 & *Davis* v. *OPERS,* 119 Ohio App. 181 [10th Dist. 1963]

d.  February 28, 2024: Defendant ODC receives and physically datestamps February 28, 2024 on the fully completed application **(Fed. Exh. 2; State Exh. A-1**). The face of the form contains no notary line, no witness requirements, and zero reference to an identity-verification checkpoint. This instrument contained absolute commands to immediately transfer Plaintiff's vested capital out of the low-interest-bearing OPERS repository and into a market-oriented, high-yield investment account managed within ODC.

e.  February 28 – July 10, 2024 ("The Shadow Period"): ODC enters a 130-day phase of unauthorized fund retention and administrative latency, refusing to execute the rollover (**Fed. Exh. 5; State Exh. A)**.

f.  May 28, 2024 (The Mitigation Directive, Prophylactic Submission, and Operational Checkmate): To penetrate the accrued institutional latency and force an evidentiary breakout, Plaintiff initialized a secondary, prophylactic rollover application delivered under protest directly to OPERS (**Fed. Exh. 3; State Exh. A-2, G**).Applying an acute clinical mastery of state operational mechanics to penetrate the interlocking administrative closed-loop, Plaintiff initialized a secondary, prophylactic rollover

15

instrument commanding the immediate migration of vested capital from the OPERS repository into the market-oriented accounts of ODC—a submission completely absent any face-of-the-form demand for third-party signature certification—functioning as a sophisticated forensic gambit to initialize an inescapable win-loss asymmetry and solidify a permanent operational liability threshold, while explicitly preserving the legal priority of the primary February 26 instrument. Defendants completely ignored this secondary filing for a month, allowing the private capital to sit sequestered while the enterprise retroactively engineered an artificial electronic portal timestamp to distort the evidentiary trail.

g.  June 26–27, 2024 (The Initial Overt Disclosure of the Notary Protocol): The engineered timeline and structural portal asymmetry finally crystallized on June 26, 2024, when the electronic record captured an audacious transmission from OPERS (7:24 p.m.) asserting that the application remained 'pending new information'—the initial overt disclosure of a post-facto, un-promulgated 'Notary Protocol' (**Fed. Exh. 4; State Exh. H**). This pattern of operational concealment was permanently pinned down less than 24 hours later on June 27, 2024 (11:42 a.m.), when OPERS agent Abuell provided a dispositive admission against interest, explicitly confirming that the purported notary 'mandate' constitutes a mere unpublished, un-promulgated internal policy. Because the artificial timestamp reflects only a retroactive portal entry and not the definitive data-transfer metrics, a clinical adverse inference is mandatory to establish the fraudulent nature of this timeline.

i.  The Liability Waiver Trap and Estoppel Framework: This post-facto hurdle was deliberately weaponized to reset the statutory vesting window and mask the

accrued conversion of capital. Defendants explicitly signaled that compliance with this non-statutory gauntlet would be twisted into a structural liability waiver to moot the active litigation.

ii. When Relator's formal attorney demand letter seeking immediate capital conveyance was met with a summary administrative rejection, the racketeering enterprise was fully exposed. While OPERS maintains an online account ledger (**Fed. Exhibit 4A-4F**), the intentional configuration of the portal to obstruct a user's retrieval of dispositive correspondence necessitates a judicial finding of structural fraud via evidence suppression. Furthermore, Defendants are judicially estopped from asserting this protocol as a uniform security requirement, as institutional records confirm that the enterprise successfully processed a $50,000.00 childcare distribution for Plaintiff completely absent any demand for notarization.

h. July 8-10, 2024 (The Operational Admission & Spoliation Event): The July 8, 2024 Fiduciary Admission Against Interest: The 130-day "Shadow Period" of unauthorized fund retention and administrative latency is conclusively broken by direct written and oral admissions from the defense. On July 8, 2024, Plaintiff engaged in a critical operational communication with ODC Account Executive Oleg Prozapas (**Exh. A; Fed. Exh. 5**). During this specific transaction, Defendant ODC formally verified and confirmed Plaintiff's identity over the telephone.

i. Following this definitive identity validation, Account Executive Prozapas formally confirmed that Plaintiff's primary rollover form had been processed and forwarded "in the normal course of business." This correspondence serves as a

17

binding, self-authenticating admission against interest on multiple operational fronts. First, it explicitly confirms Defendant ODC's physical receipt and execution of the underlying request. Second, while the agency's internal tracking notes mistakenly identify the operational date as February 29, the primary instrument itself is physically datestamped February 28, 2024—exposing a baseline record-keeping clerical deficit within the agency's systems.

ii. Fed. Exh. 5 explicitly documents that the underlying procedural mechanics were fully correct, proper, and authorized under black-letter Ohio law to migrate the vested capital out of the low-interest OPERS repository and into the market-oriented accounts of ODC. Finally, the correspondence explicitly states that ODC *had not yet received* the actual fund conveyance from OPERS, affirmatively certifying that ODC did not simply sit on the document from inception. Instead, this admission effectively splits the liability trail: it proves that while ODC initially processed the contract, the administrative enterprise subsequently failed to maintain its non-delegable statutory preservation duties, precipitating a comprehensive relational spoliation event wherein Defendant ODC formally confesses its failure to preserve the primary transmission packet allegedly conveyed to OPERS by its representative, Ms. Nelson, while Defendant OPERS concurrently maintains an absolute clinical denial of the instrument's very materialization.

iii. Critically, ODC has since confessed it failed to preserve the operative transfer packet (**Fed Exh. 21; State Exh. A.4-11**), while OPERS suppressed the document within Case No. 24AP-432/2025-850. This engineered administrative latency and

18

documented record destruction establish the baseline status quo of bad faith necessitating judicial intervention.

i. July 12, 2024 (The Mandamus Initiation): Plaintiff initialized a formal Original Action in Mandamus before the Tenth District Court of Appeals (*Case No. 24AP-432*; **Fed. Exh. 6**), explicitly invoking constitutional anchors on page 4. Within page 7 of the Petition, Relator codified the systemic deprivation of property entitlements, affirmatively stating that as the mandatory fiduciary custodian of these funds, OPERS maintains an absolute, non-discretionary duty to execute title directives. Plaintiff further established that institutional pretexts concerning enrollee protection cannot be weaponized as a lawless administrative shield to strip citizens of their vested property interests. See *Conley v. Gibson*, 355 U.S. 41, 47 (1957) (establishing that modern notice pleading frameworks require only that a petition provide fair warning of the underlying constitutional anchor claims).

j. July 18, 2024: Judge Betsy L. Shuster signed a journal entry assigning magistrate Joseph E. Wenger IV as a Rule 53 magistrate.

k. August 1, 2024 (The Fraudulent Dismissal Pretext): In lieu of filing a statutory Answer or submitting to an evidentiary framework, Defendant OPERS files a Motion to Dismiss (**Fed. Exh. 7**) inside the state court mandamus proceeding, deploying a multi-layered matrix of material misrepresentations of fact and law to intentionally evade its non-discretionary ministerial duties. Specifically, the face of the state record reveals the following irreconcilable contradictions and bad-faith maneuvers:

i. The Fabricated Notice Timeline (Page 3): OPERS affirmatively asserts to the tribunal that it timely provided the un-promulgated "Notary Form" to Plaintiff

19

prior to the accrual of its distribution default—a provable, baseline falsehood explicitly exposed by the electronic metadata and the correspondence ledger of record (**State Exh. H**).

ii.   The False Multi-Tier Threshold (Page 4): OPERS claims that the extra-statutory identity-verification gauntlet is universally required for all financial transfers exceeding $10,000.00. This baseline assertion constitutes a profound administrative fraud; Defendants successfully processed an un-notarized $50,000.00 childcare distribution for Plaintiff in 2025, completely exploding their claims of a uniform security protocol and establishing the ad hoc, punitive nature of the hurdle.

iii.  The Futile "Refusal to Verify" Pretext: OPERS maintains the fraudulent narrative that its unauthorized sequestration of capital was necessitated by Plaintiff's purported refusal to validate his identity. This administrative fiction deliberately suppresses the forensic reality that the enterprise was already in physical possession of two primary, unconditioned contract instruments, alongside explicit title directives and an absolute waiver of supplementary verification. A calculated disregard for verified commands constitutes bad faith incarnate, designed exclusively to mask an illegal asset conversion.

iv.   The Absurd Statutory Deconstruction (Page 7): OPERS engages in a legally insupportable statutory deconstruction of Chapter 145 of the Ohio Revised Code. Seeking to expand its unauthorized administrative float window, OPERS remarkably asserts that the legislature's strict command that the retirement system *shall* pay a departed beneficiary their accumulated contributions does not import a

20

mandate for immediate operational execution. By arguing that "shall" does not mean "now," OPERS openly seeks to transform a non-discretionary ministerial command into an un-reviewable, open-ended instrument of asset conversion.

v. The Irreconcilable Notary Estoppel (Page 8): In a fatal structural admission, OPERS explicitly argues on page 8 of its brief that a notarized acknowledgment constitutes "conclusive proof of an individual's identity." Concurrently, however, OPERS disregards, minimizes, and seeks the summary dismissal of Plaintiff's signed, notarized, and verified lawsuit—documents that provided the exact conclusive proof of identity, property rights, and explicit capital conveyance demands that OPERS claimed it required. Defendants systematically hide behind a distorted administrative shell to reject the very "conclusive proof" they mandated under the bad-faith guise of "fraud protection."

l. August 14, 2024 (The Forensic Counter-Strike & Summary Judgement Demand): Plaintiff, through counsel, filed a dual-pronged response in opposition to Defendant OPERS' Motion to Dismiss and a concurrent Motion for Summary Judgment (**Fed. Exh. 8**). This filing explicitly challenged the administrative efforts to evade judicial review, noting that the tribunal is bound to accept well-pleaded factual allegations as true and construe the record in the light most favorable to the non-moving beneficiary. Plaintiff dismantled the Defendants' semantic deconstruction of the statutory command "shall," establishing that mandamus remains the exclusive legal instrument to compel the execution of OPERS' non-discretionary ministerial duties (**Fed. Exh. 8, pg. 8**). Because the state actors failed to submit competent evidence to rebut the verified allegations of the Petition, the underlying facts of the conversion remain undisputed.

21

Plaintiff further exposed the administrative pretext of "fraud prevention" as legally irrelevant; Defendants are judicially estopped from asserting identity concerns where the Relator's identity, explicit transactional consent, and vested property rights are already verified on the record. Citing the United States Supreme Court in *Frank Lyon Co. v. U.S.*, 435 U.S. 561 (1972), Plaintiff moved for summary judgment, demanding that the court prioritize substance over administrative form. Plaintiff codified the ongoing, unconstitutional deprivation of assets, specifically documenting the total institutional silence regarding the primary February 2024 fund-transfer application. See *Gibson v. Berryhill*, 411 U.S. 564, 575 (1973) (establishing that administrative exhaustion is never required when the state administrative process is proven to be structurally futile, biased, or complicit in fraud).

m. August 21, 2024 (The Operational Smoking Gun & Enterprise Motive Confession): Defendant OPERS, via counsel Sam Peppers, files its Reply in Support of its Motion to Dismiss and Memo Contra Plaintiff's Motion for Summary Judgment (**Fed. Exh. 9**). In this singular instrument, the administrative enterprise formally "tells on itself," providing explicit, written proof of an active conspiracy, a predatory economic motive, and a total distortion of the constitutional order. Specifically, the face of the filing locks in the following fatal entries:

i. The Paradoxical Sanction Narrative and Pretextual Jurisdictional Shields: To advance this bad-faith containment architecture, OPERS explicitly classified Plaintiff's lawful refusal to sign an extra-statutory liability waiver for the agency's accrued defaults as a "specious" objection. In a fatal structural contradiction, OPERS asserted within the same brief that its un-promulgated notary verification

22

checkpoint is merely "sanctioned" by its broad internal rulemaking authority, rather than explicitly "required" by any operational mandate. This semantic shift severely damages the defense's credibility and completely undermines its position across several other parts of the record, where the agency repeatedly asserted the protocol was a rigid, non-discretionary identity-verification hurdle with which all beneficiaries must uniformly comply.

ii. The Captured Commercial Float Motive:The predatory economic motive behind this regulatory artifice is exposed on the state docket. While Defendants claim the un-promulgated gauntlet is a "uniform identity-verification requirement," they concurrently admit the protocol is restricted to transfers exceeding $10,000.00. This admission destroys their security defense—as identity threats do not vanish below arbitrary five-figure thresholds—and proves the protocol is an asset-retention weapon designed to capture and float high-value capital for illicit enrichment while depriving departing workers of liquid assets.

iii. The Multi-Million-Dollar Float Admission (Page 11): In a staggering blow to its own defensive framework, OPERS explicitly admits that it systematically requires "tens of thousands of other former public employees" to comply with this un-promulgated, extra-statutory "Notary Policy" before they are permitted to access their vested funds. By documenting that this gauntlet is deployed across a vast, statewide matrix of thousands of citizens, OPERS has formally codified the baseline *numerosity, continuity, and pattern of racketeering activity* required to sustain a Federal Civil RICO action. This admission exposes the true commercial motive: the intentional creation of a massive, unauthorized administrative float

23

network designed to illicitly preserve capital reserves for the enterprise while starving departing workers of their liquid assets.

iv. The Total Constitutional Inversion: By labeling this extra-statutory hurdle a mere "minor ministerial" requirement on page 11 while simultaneously using it as an absolute barrier to block non-discretionary fund transfers, OPERS sets its entire operational framework at direct, violent odds with the Constitution of the State of Ohio. OPERS is an administrative body restricted entirely to executing *ministerial functions* based on the explicit statutory directives of its members. The beneficiary issues the instruction; the retirement system obeys the command. By inventing an unpublished, discretionary identity gatekeeper to override absolute statutory vesting commands (R.C. 145.40), OPERS has attempted a lawless administrative coup, positioning its internal corporate-adjacent policies above the black-letter mandates of the Ohio General Assembly and the United States Constitution.

n. August 27, 2024 (The Conclusive Fact Lock-In): Plaintiff/Relator files their formal Response and subsequent evidentiary record entries, executing a clinical checkmate against the state actors' dismissal pretext. By analyzing the structural omissions and silent defaults within Defendants' moving papers, the record establishes that the central components of the asset conversion are now undisputed. Specifically, the face of the record documents the following fatal admissions by omission:

i. Uncontested Directives and Timelines: Defendants explicitly acknowledge physical receipt of both the primary February 26, 2024 and the secondary May 28, 2024 fund-transfer legal commands. Furthermore, Defendants mount zero

24

objection or counter-evidence to the specific factual assertions contained within the sworn Affidavit attached to the Complaint.

ii. Concession of the Vesting Metric: Defendants offer no dispute, argument, or alternative calculation regarding Relator's absolute statutory vesting date of February 27, 2024. By operation of law, legal title to the sequestered assets is established as uniquely and irrevocably vested in the Relator from that moment forward.

iii. The Unpublished Policy Admission: Defendant OPERS explicitly admits that its refusal to execute the non-discretionary rollover directive was predicated solely and uniquely upon compliance with their un-promulgated, unpublished "Notary Policy"—thereby establishing that no statutory, regulatory, or face-of-the-contract barriers existed to block the transmission.

iv. Conclusive Estoppel of Identity Notice: Defendant OPERS acknowledges physical receipt of both Plaintiff's formal attorney demand letter and the subsequent notarized, verified Complaint. By their own legal definitions, Defendants are trapped; having already argued that a notary acknowledgment is conclusive proof of identity, they cannot escape the fact that they remained in willful default while holding absolute, verified proof of Relator's identity, property rights, and explicit legal transactional commands.

v. Legality of the Rollover Conceded: Defendants explicitly concede on the record that Relator's requested capital rollover from the OPERS repository into the market-oriented accounts of ODC is fully authorized, proper, and permissible under black-letter Ohio law. By admitting the transaction was entirely lawful,

25

Defendants eliminate any administrative defense of impossibility, confirming that their ongoing retention of capital constitutes a deliberate, bad-faith tool of institutional attrition.

o. Summer-Fall 2024: Operating within a phase of persistent administrative latency, the state tribunal fundamentally defaulted on its mandatory oversight, failing to conduct even a solitary due process evidentiary assembly. In a staggering admission of institutional hostility, Defendant OPERS' counsel audaciously asserted on the record that such hearings would be functionally "worthless"—a lawless defensive posture the court effectively ratified through its continued operational silence. Confronting this structural breakdown, Plaintiffs formally initialized a clinical litigation hold and absolute final demand notice to counsel for OPERS to secure the digital infrastructure. To further expose this systemic constitutional property deprivation, Plaintiffs initialized formal outreach to various legislative members, providing forensic notice of the ongoing institutional collapse.

p. December 16, 2024: Counsel for Plaintiff submitted a formal Motion to Expedite Proceedings and for a first Pre-Hearing Telephone Conference within Case No. 24AP-432. Plaintiff maintains that the unbridled exercise of administrative power serves only to dilute fundamental individual liberties. The systematic denial of property access absent requisite due process establishes a perilous institutional precedent. Because private ownership is inextricably linked to personal autonomy, any administrative encroachment must be rigorously challenged (**Fed. Exh. 10, pg. 5**).

q. December 18, 2024 (The Settlement Renunciation): In a formal transmission, the state actors affirmatively asserted that OPERS' governing statutes prohibit any form of

26

informal resolution or negotiated settlement, audaciously concluding that a pre-hearing telephone conference would be functionally "worthless." (**Fed. Exh. 11, pg. 2**). Within this same instrument, OPERS knowingly perpetrated a fraud upon the tribunal by falsely alleging that Plaintiff's constitutional claims were raised for the first time via motion, deliberately ignoring the explicit constitutional and property-right specifications contained within the primary Petition. A clinical adverse inference for this bad-faith misrepresentation is required under *Adkins v. Wolever*. Within page 5 of its moving papers, OPERS audaciously asserts a structural inability to grant Plaintiff individualized treatment, while paradoxically confessing to the selective application of an extra-legal five-figure threshold—a projection of administrative pretext designed to mask selective attrition. By page 7, the enterprise again falsely asserts the absence of constitutional issues in the initial filing; recognizing that the truth of the record would necessitate their undoing, Defendants deployed this multi-layered matrix of deception to secure a summary dismissal and evade statutory oversight:

i. The Direct Rebuttal of Institutional Incapacity to Settle: Such a preposterous administrative assertion stands as a provably false and legally bankrupt narrative. For more than a decade, the Relator has operated at the highest echelons of the Ohio state infrastructure, discharging critical duties as Legal Counsel to the Auditor of State, serving as a lead forensic investigator/attorney within the Department of Education, and executing plenary authority as the Executive Director of a state regulatory body. This extensive tenure has forged an unparalleled, clinical mastery of administrative operational mechanics, leveraging a specialized investigative skill set—honed by the state itself—to forensically

27

identify and dismantle the precise species of multi-front institutional malfeasance currently at issue.

    ii.    In the actual operations of state governance, settlement occurs in the vast majority of civil and administrative disputes precisely to ensure the efficient, fiduciary deployment of limited public resources and to prevent the compounding of statutory liabilities. By fabricating a sweeping, non-existent statutory prohibition against informal resolution to justify their refusal to speak, while concurrently enforcing an un-promulgated five-figure checkpoint,

r.    December 20, 2024 (The Rebuttal of Administrative Pretext): Plaintiff submitted a formal Reply in Support of the Motion for Due Process (**Fed. Exh. 12**), clinically dismantling OPERS' superfluous and dilatory defensive posture. This instrument explicitly exposed the accrued evidence of bad faith, documenting on page 8 the profound public interest at stake within this litigation. By page 9, Plaintiff codified Defendants' strategy of attrition—characterized by a calculated pattern of delay, denial, and systemic defense that prioritizes institutional survival over truth, trust law, or fiduciary duty. In a total inversion of the constitutional order, OPERS attempted to reposition itself as the master of the beneficiary; however, under black-letter law, the retirement system exists solely to execute minor ministerial functions at the instruction of the member. Citing the United States Supreme Court in *Heckler v. Chaney*, 470 U.S. 821 (1985), Plaintiff established on pages 11-12 that while administrative discretion is a functional necessity, it cannot serve as a "veil for laziness, corruption, incompetency, lack of will, or other motives," nor can it insulate arbitrary state action from judicial review. Leveraging the high court's holding in *U.S. v. Wunderlich*, 342 U.S. 98, 101

28

(1951), Plaintiff issued a direct rebuke to OPERS' claims of unbridled authority, asserting that the law achieves its "finest moments" when it liberates the citizen from the "unlimited discretion" of the bureaucrat. Counsel for Plaintiffs—serving concurrently as Chair of the Ohio State Bar Association's Ethics Committee—formally noted that the preservation of the rule of law is predicated upon a sworn oath and a binding promise of action.

s. December 23, 2024 (The Administrative Desertion & Fraudulent Recommendation): This federal action arises from the systemic, *ultra vires* overreach initiated in *State ex rel. Haydocy v. Ohio Public Employees Retirement System*, 10th Dist. Franklin No. 24AP-000432. In that proceeding, despite explicitly finding that Plaintiff met all statutory prerequisites and that Defendants had received a formal account transfer request, Magistrate Wenger issued a fraudulent report and recommendation for summary dismissal (**Fed. Exb. 13**). This recommendation was reached in a total abdication of judicial duty—without a single due process evidentiary assembly or forensic record examination—and remarkably sought to extinguish claims against a non-moving party who had submitted the singular certified evidentiary packet on the record. This collapse of the state-level administrative process was defined by the following tactical and operational realities:

  i. Mid-Litigation Desertion: Synchronized precisely with the crystallization of formal admissions concerning institutional record spoliation, OPERS Counsel Sam Peppers executed a sudden, mid-litigation abdication of his post. See *Illinois v. Wardlow*.

29

ii. Adoption of Unsworn Fabrications: Within hours of defense counsel's tactical desertion, the Magistrate adopted the unsworn, extra-statutory fabrications of the defense, concurrently disregarding the well-pleaded factual allegations of the Petition and erroneously condoning Defendants' extra-legal imposition of redundant, double-notarized forms to stall a purely ministerial asset rollover.

iii. Structural Collapse of Authority: By prioritizing formalistic administrative bureaucracy over vested property rights, the Magistrate's recommendation fell clinically outside the plenary scope of Rule 53, transforming a routine, ministerial transfer into an unconstitutional conversion in direct violation of Article 1, Section 1 of the Ohio Constitution.

iv. Consequently, because the state administrative framework was weaponized to execute a bad-faith sequestration of private capital, the state appellate record stands independently verified as a structural failure. This systemic refusal to release captured capital necessitates the immediate, direct intervention of federal equity to bypass this unchecked agency overreach and enforce immediate asset restoration.

t. December 24, 2024 (The Constitutional Rebuttal): In response, Plaintiff executed a formal forensic counter-strike, filing twenty-three distinct objections and a concurrent motion to set aside the findings (**Fed. Exh. 14**), which are incorporated by reference herein. These objections establish the following legal and operational realities:

i. The Statutory Vesting Metric and Expiration of Administrative Float: Following the conclusion of a sixty-day window triggered by the separation of Mr. Haydocy from state employment, all sequestered capital transformed into the Plaintiffs'

30

private holdings by virtue of legislative mandate. While the General Assembly authorizes a temporary sixty-day period of administrative retention, the legal framework dictates that once this duration elapses, these vested entitlements belong uniquely to the citizen.

ii. Fiduciary Breach and Conversion: By prioritizing formalistic administrative bureaucracy over vested property rights, Defendants weaponized their discretion to execute a bad-faith sequestration of private capital. This bad-faith delay transformed a routine ministerial transfer into an unconstitutional conversion in direct violation of Article 1, Section 1 of the Ohio Constitution.

iii. Subordination of the Administrative State: The filing codified the sovereign maxim that administrative departments are mere subordinate agents of the public will, lacking the authority to impose un-promulgated procedural hurdles.

iv. Consequently, the state appellate record stands independently verified, establishing that Defendants acted entirely outside their statutory authority. This systemic refusal to release captured capital necessitates the immediate, direct intervention of federal equity to bypass this unchecked agency overreach and enforce immediate asset restoration.

u. January 3, 2025: Defendant OPERS submitted a Memorandum in Opposition (**Fed. Exb. 15**) that codified a series of fatal, self-authenticating admissions:

i. Admission of Un-Promulgated Barriers (p. 5, 7): OPERS asserted its notary hurdle as a mandatory prerequisite for disbursements over $10,000 without citing a single statutory provision, formally admitting it is sequestering capital to verify transactional legitimacy through a singular, *ad hoc* administrative mechanism.

31

ii. Admission of Explicit Statutory Authorization (p. 13): OPERS acknowledged the Magistrate's finding that Relator's requested transfer process is specifically authorized under Ohio law.

iii. Admission of Systematic Retention (p. 14): While dismissing as "absurd" the reality that the notary requirement serves as a vehicle for institutional enrichment, OPERS claimed the gauntlet is a uniform identity verification tool with which all other beneficiaries "routinely comply," audaciously noting that "no alleged retention of funds *typically* occurs"—a formal admission that fund retention does, in fact, occur in direct violation of settled precedent.

iv. Defective Administrative Syllogism (p. 16, 19): OPERS deployed a structurally defective legal syllogism, asserting that because R.C. 145.40 is silent regarding an explicit notary prohibition, the agency possesses unbridled authority to invent extra-statutory hurdles. It further admitted that its unpublished protocol was merely "amply communicated" to Relator, masking the retroactive application of the hurdle while acknowledging that Relator's underlying Petition was already accompanied by a fully notarized verification affidavit.

v. Structural Collapse of Authority: By prioritizing formalistic administrative bureaucracy over vested property rights, the Magistrate's recommendation and OPERS' subsequent filings fell clinically outside the plenary scope of Rule 53, transforming a routine, ministerial transfer into an unconstitutional conversion in direct violation of Article 1, Section 1 of the Ohio Constitution.

vi. Consequently, because the state administrative framework was weaponized to execute a bad-faith sequestration of private capital, the state appellate record

32

stands independently verified as a structural failure. This systemic refusal to release captured capital necessitates the immediate, direct intervention of federal equity to bypass this unchecked agency overreach and enforce immediate asset restoration.

v. January 8, 2025: Relator submits a formal Reply in Support of the Motion to Set Aside, clinically documenting the profound due process failures and engineered procedural inertia paralyzing these proceedings. Plaintiff maintains that the arbitrary exercise of administrative authority constitutes, by its very nature, a form of institutional tyranny. Under settled constitutional principles, a citizen possesses an absolute right to challenge government overreach and cannot be coerced into submitting to extra-statutory demands that lack a lawful basis. The core assessment of fiduciary obligations further underscores why the honor and sworn duty of a fiduciary remain non-negotiable requirements of the sovereign compact.

w. January 10, 2025 (The Censorship Strike): Respondent Ohio Public Employees Retirement System (OPERS) filed a Motion to Strike pursuant to Tenth District Loc.R. 13(M)(2), targeting Relator's January 8, 2025 Reply Brief regarding the Motion to Set Aside the Magistrate's Decision (**Fed. Exh. 16**). In its motion, OPERS asserts that it is legally improper for a public beneficiary to invoke the broader public interest within this litigation—a position Relator contends demonstrates systemic institutional hostility toward transparency and the constitutional order. In a concurrent Memorandum in Opposition (**Fed. Exh. 17**), Relator counters this administrative overreach by framing the dispute as an existential defense of civic liberty, invoking the historical warnings of Ronald Reagan to underscore that freedom and public accountability must be actively

33

protected and handed down to future generations rather than surrendered to restrictive administrative boundaries.

x. January 13-15, 2025 (The Formal Legislative Notice & Request for Contractual Integrity): Between January 13 and January 15, 2025, Plaintiffs issued a formal demand and legislative notice (**Fed. Exh. 18**) directly to ODC Leadership, Board Chairman Chris Mabe, and the elected state legislators representing Plaintiffs' home districts—specifically Senator Beth Liston and Representative Anita Somani—demanding immediate execution of the rollover directive and providing explicit notice of the ongoing, multi-agency statutory violations.

i. Rather than executing its non-discretionary fiduciary duties, the enterprise engaged in a calculated administrative pass-around. The file was initially shunted to a Dayton-based agent, Ken Thomas, who maintained absolute operational latency before asserting an impending medical leave to insulate the agency from accountability. ODC then attempted to completely sever direct communication by transferring the matter to ODC counsel AAG Caroline Hopkins, who issued a series of evasive, legally incoherent responses designed to absolve the agency of its trust obligations.

ii. Throughout the litigation lifecycle, Plaintiffs maintained a persistent demand for the production of the dispositive, fully executed February 26, 2024 rollover instrument. ODC formally acknowledged on January 15, 2025, that this primary contract was received as "fully completed" before being transmitted to OPERS on July 10, 2024, bearing the authenticating signature of representative Julia Nelson. Despite this admission, in a clinical display of structural fraud, the agency

34

systematically produced only *unsigned* and fragmented entries, feigning a lack of custody over the precise transactional instruments they previously certified as complete. This deliberate administrative blackout was subsequently integrated into the factual findings of multiple tribunals. The racketeering enterprise recognizes that the materialization of the fully executed ODC contract would be fatal to its containment model; consequently, they utilize a calculated strategy of attrition to suppress this evidence and evade judicial scrutiny.

iii. This engineered information deficit and subsequent data-wiping constitute a deliberate, structural mechanism to conceal fraudulent transmissions, including the mail and wire fraud evidenced in Federal Exhibit 19. Defendants executed this strategy precisely as Plaintiffs applied rigorous legal pressure to ODC leadership. Faced with exposure, administrative actors deployed a calculated diversionary tactic: issuing a pretextual, "phantom" notice for an administratively invalid hearing. This bad-faith notice was manufactured exclusively to project a false veneer of due process while consciously ignoring Plaintiffs' formal requests for oral argument on the core complaint.

iv. By holding Plaintiffs in this artificial holding pattern, Defendants secured a temporary procedural delay to coordinate their internal narrative. Once this defensive posture was finalized, Defendants utilized AAG Hopkins's January 21, 2025 correspondence to formally admit to the non-retention, loss, and destruction of the dispositive July 2024 transaction records, while willfully blinding themselves to their own systemic misconduct by telling the beneficiary to look for the records at OPERS.

35

v.  This sequence exposes an operational posture of weakness masquerading as bureaucratic strength—a state apparatus weaponizing nominal compliance mechanisms to hide the systemic spoliation of fiduciary records. Because these bad-faith procedural maneuvers are maintained strictly to immunize a fraudulent cover-up, standard pleading thresholds are entirely preempted, and immediate judicial intervention is mandated to open civil discovery.

y.  January 16, 2025: An unsigned "Lulling Letter" is issued to Plaintiff fabricating a "non-oral hearing" window to simulate judicial due process while masking the systematic sanitization of the record (**Fed Exh. 19; State Exh. I-5, I-6**). The purpose of this letter was to lull Plaintiffs into a false sense that due process was being afforded while records were actively being destroyed.

z.  January 17, 2025 (The Jurisdictional Buck-Passing): AAG Carolyn Hopkins, in a formal communication copied to ODC Executive Director Lauren Gresh, affirmatively asserts that Plaintiff's capital remains un-transmitted from the OPERS repository. In a clinical effort to insulate the enterprise from its accrued defaults, ODC disclaims any statutory power to liquidate assets held within a separate retirement system, directing Plaintiff to seek redress from OPERS—a party ODC explicitly knows is the primary adversary in active litigation. This missive serves as further evidence of a coordinated administrative closed-loop designed to perpetuate asset sequestration through engineered latency and referral loops (**Fed. Exh. 20**).

aa. January 21, 2025: The institutional consciousness of guilt is further punctuated by the formal admissions of ODC Counsel Carolyn Hopkins, who certified that while State Exhibit A-1 was received as a definitive, fully executed contract on February 28, 2024,

36

the administrative enterprise subsequently "did not retain"—and thus clinically spoliated—the primary fund-transfer packet (**State Exh. A.4-11; Fed Exh. 21**). See *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 432 (1982) (establishing that a state-level system violates the Due Process Clause when it weaponizes administrative hurdles or clerical defaults to terminate a citizen's vested property entitlements without a meaningful merits review).

i.  Furthermore, Federal Exhibit 21 establishes a structural informational cover-up via the January 21, 2025, written admission by AAG Caroline Hopkins that Defendant ODC "did not retain a copy" of dispositive evidence and held "no record" of its receipt or the actors involved. Despite possessing sufficient information to act, Defendants refused their non-discretionary fiduciary duties.

ii.  This self-authenticating admission exposes a systemic failure by a statutory trustee to maintain custody of a beneficiary's retirement assets. Instead of fulfilling its obligations, ODC directed Plaintiff to seek missing records from OPERS—an adverse party participating in a coordinated informational "ping-pong match" designed to trap the citizen in an administrative loop.

iii.  This engineered information deficit and subsequent data-wiping constitute a deliberate structural mechanism to conceal fraudulent transmissions, including the mail and wire fraud evidenced in Federal Exhibit 19.

iv.  Defendants executed this strategy precisely as Plaintiffs applied rigorous legal pressure to ODC leadership. Faced with exposure, administrative actors deployed a calculated diversionary tactic: issuing a pretextual, "phantom" notice for an administratively invalid hearing. This bad-faith notice was manufactured

37

exclusively to project a false veneer of due process while consciously ignoring Plaintiffs' formal requests for oral argument on the core complaint.

v. By holding Plaintiffs in this artificial holding pattern, Defendants secured a temporary procedural delay to coordinate their internal narrative. Once this defensive posture was finalized, Defendants utilized AAG Caroline Hopkins's January 21, 2025 correspondence to formally admit to the non-retention and destruction of the dispositive July 2024 transaction records.

vi. This sequence exposes an operational posture of weakness masquerading as bureaucratic strength—a state apparatus weaponizing nominal compliance mechanisms to hide the systemic spoliation of fiduciary records. Because these bad-faith procedural stays are maintained strictly to immunize a fraudulent cover-up, standard pleading thresholds are entirely preempted, and immediate judicial intervention is mandated to open civil discovery.

bb. January 28, 2025 (The Discovery Demand): Relator submitted a formal Motion to Compel Discovery (**Fed. Exh. 22**), a clinical tactical maneuver designed to secure the evidentiary markers of institutional malfeasance and formally document Defendants' systemic abuse of administrative discretion.

cc. February 5, 2025 (The Jurisdictional Evasion & Discovery Strike): Defendant OPERS submitted its Memorandum in Opposition to Plaintiff's Motion to Compel (**Fed. Exh. 23**), advancing a fraudulent narrative that civil discovery is categorically barred in mandamus actions. Seeking to engineer a fabricated "pension board carveout," OPERS conceded that its August 1, 2024 Motion to Dismiss was filed in lieu of a statutory Answer, yet shamelessly argued that no certified record could exist—deliberately

38

ignoring Plaintiff's notarized evidentiary payload which completely explodes their defensive pretext.

i. On page 3, the enterprise explicitly conceded that Plaintiff targets a singular, dispositive instrument: the fully executed rollover form transmitted by ODC on or about July 10, 2024. This specific notation strips the enterprise of any claim to ambient administrative regularity, isolating the dispute to a single document that OPERS actively chose to withhold while concurrently maintaining that its administrative record remained uncompiled.

ii. By page 5, OPERS collapsed its own defensive logic, remarkably admitting that the Tenth District retains absolute inherent authority to order discovery under controlling Ohio law. To circumvent this authority, the enterprise integrated a series of highly deceptive legal comparisons. Citing *State ex rel. Julia Phillips v. OPERS* to justify its accrued latency, OPERS executed a blatant misrepresentation of fact; the *Phillips* court conducted a mandatory, recorded status conference on December 6, 2023—a baseline procedural safeguard that remains entirely non-existent in Case No. 24AP-432.

iii. Similarly, OPERS' reliance on *Sharon Thomas v. STRS* is legally bankrupt. While OPERS showcased *Thomas* to argue that a relator's discovery requests should be stricken, the *Thomas* entry reveals that the Common Pleas Court vacated its trial schedule specifically to replace it with a formal "Schedule for Submission of Evidence and Merit Briefing." OPERS explicitly weaponized the *striking* of discovery while intentionally concealing that the *Thomas* relator was granted an

unrestricted statutory window to submit independent evidence on the merits—a right systematically denied to the Relator herein.

 iv. Finally, while conceding on page 7 that the record is completely devoid of factual dispute because OPERS had refused to answer, the enterprise openly admitted that the very document Plaintiff sought "may well be contained in OPERS' Certified Record not yet filed with the Court." This admission exposes the structural circularity of the defense: OPERS argued that judicial review is strictly limited to the certified record, admitted that it had not filed the record, admitted that the missing record likely contained the dispositive evidence of consent, and used its own self-engineered delay to assert that Plaintiff's demands were "premature." This sequence demonstrates that the state apparatus systematically deployed deceptive litigation filings to maintain an artificial information vacuum, using nominal appellate precedent to insulate an active concealment scheme from judicial review which is clear and convincing evidence of consciousness of guilt.

dd. February 11, 2025 (The Clinical Rebuttal of Discovery Evasion): Plaintiffs/Relator submitted a formal Reply in Support of the Motion to Compel Discovery (**Fed. Exh. 24;** State Court Record 24AP-000432), dismantling OPERS' defensive posture by citing settled Tenth District and Ohio Supreme Court precedent establishing that discovery is fully permissible in mandamus actions to resolve factual disputes or demonstrate an abuse of discretion.

 i. Within this filing, Plaintiff explicitly invoked Ohio Rules of Professional Conduct Rule 8.4(d), putting Assistant Attorneys General Lisa A. Reid and Henrique A. Geigel on formal notice that their systematic misrepresentations of statutory law

40

and defense of an un-promulgated policy constituted conduct prejudicial to the administration of justice.

ii. Furthermore, Plaintiff completely exposed the central paradox of the agency's defense: while OPERS carefully argued in its legal briefs that administrative rules merely "sanctioned" notarization, it concurrently and arbitrarily enforced the protocol as a mandatory prerequisite to withhold capital from departing public servants. Plaintiff permanently pinned down this institutional bad faith by pointing out that Chapter 145 contains ~40 distinct statutory provisions authorizing OPERS to waive its own internal, technical mechanisms for a member's convenience, establishing that their rigid, ad hoc enforcement of the unpublished notary barrier against Plaintiff was a calculated tool of discrimination and economic attrition.

ee. February 20, 2025 ("The Phantom Hearing"; **Fed. Exh. 19**): The Tenth District conducts a non-oral administrative assembly. Plaintiff's counsel is present and available, but is denied the right to address the panel, introduce evidence, or confront fact witnesses. Counsel registers formal due process objections with Court Administrator Eaton, exposing this administrative charade as affirmative evidence of systemic bad faith. From the initial mailing to the procedural absurdity of the "non-oral hearing," the Tenth District and the Clerk appear to have acted in concert to facilitate the spoliation of evidence and evade accountability for said destruction. See *Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639, 647 (2008) (confirming that civil RICO claims predicated on mail or wire fraud do not require proof of direct reliance by the plaintiff, so long as the broader systemic scheme caused the underlying property loss).

41

ff. April 1, 2025 (The Formal Discovery Volley): While operating without knowledge of the Tenth District's active complicity in the ODC/OPERS coordinated administrative conspiracy, Plaintiff submitted a primary set of twenty-eight formal interrogatories and discovery requests to counsel for OPERS (**Fed. Exh. 24**). This tactical disclosure demand targeted the operational mechanics of the un-promulgated notary policy, the identities of the specific administrative actors involved, the internal manual of procedures, and the verification methods utilized to sequester assets. The instrument further sought the production of all integrated communication logs between the two agencies and a definitive, market-adjusted valuation of the Plaintiff's sequestered capital accounts.

    i. Incorporating an April 1, 2025, electronic transmission from Lisa Reid to the Undersigned, with Henrique Geigel copied (**Fed. Exh. 24A**), counsel for OPERS initialized this communication by misspelling the undersigned's name—a clinical projection of administrative indifference and evasion. While acknowledging receipt of the propounded interrogatories, Reid affirmatively asserted that OPERS is mandated to object to any disclosure.

    ii. This missive serves as a dispositive admission of institutional bad faith, confirming that Defendants have engineered a procedural vacuum where substantive discovery remains functionally impossible absent federal judicial intervention.

gg. April 23, 2025 (The Renewed Procedural Demand): Relator submitted a Renewed Motion for a Rule 16 Status Conference (**Fed. Exh. 25**), formally documenting the profound institutional latency as the litigation nears its tenth month without a single due

process evidentiary assembly. This instrument explicitly challenged the administrative vacuum surrounding the unresolved Motion to Compel Discovery, demanding a transparent, equitable, and forensic resolution of all pending motions to halt the ongoing sequestration of property.

hh. April 24, 2025 (The Formal Obstruction of Process): Defendant OPERS submitted its formal Response in Opposition to a Due Process Hearing (**Fed. Exh. 26**), utilizing page 2 to codify its institutional bad faith. Within this instrument, the enterprise audaciously reiterated that its governing framework prohibits any negotiated resolution of any kind, remarkably concluding that a status conference is functionally unnecessary. This defensive posture recklessly disregards the Relator's fundamental property rights and the mandatory requirements of civil procedure, serving as further evidence of the administrative enterprise's commitment to operational concealment.

    i. The Systemic Administrative Custom and Management Ratification: The coordinated, predatory actions executed by the senior leadership of OPERS and ODC—and irretrievably fixed upon this record—are not isolated administrative errors; they represent a permanent, well-settled institutional custom designed to implement extra-statutory fund-containment protocols through active data-wiping and attritional litigation tactics.

    ii. Under the controlling framework established by the United States Supreme Court in *Monell v. Department of Social Services,* 436 U.S. 658 (1978), an administrative entity faces direct liability under 42 U.S.C. § 1983 when its unconstitutional practices are so permanent, widespread, and well-settled as to carry the force of law, or when those illegal practices are actively instigated or

ratified by officials in the highest positions of management and subordinate supervisory personnel.

ii. April-May 2025 (The Institutional Blackout): The Tenth District Court of Appeals maintained a phase of calculated operational silence, systematically disregarding multiple Motions for a Pre-Hearing Conference and formal Motions to Compel Discovery. In a dispositive admission during communications with the Undersigned, the Deputy Court Administrator explicitly conceded a structural breakdown of due process within the appellate infrastructure.

    i. In his capacity as Chair of the Ohio State Bar Association's Ethics Committee, the Undersigned memorialized this systemic architecture of institutional malfeasance, presenting a forensic index of fifteen specific examples of state corruption spanning 2010 to 2025. This record of lawlessness highlighted: (a) the bad-faith defiance of supreme court orders regarding gerrymandered electoral maps; (b) the multi-billion-dollar "House Bill 6" (HB6) racketeering and bribery scheme; (c) the prioritization of corporate interests through the authorization of hydraulic fracturing in State Parks despite documented 99% public opposition; (d) the attrition of alternative energy legislation; and (e) the systemic erosion of property rights and due process.

    ii. In a total abdication of its mandatory oversight function, the Ohio State Bar Association (OSBA) proactively suppressed the committee assembly, precipitating the Undersigned's structural resignation and evidencing exhaustion of all state-level administrative remedies. As an institution explicitly tasked with

44

policing the profession, the OSBA fundamentally defaulted on its duty to act by maintaining a posture of blind indifference.

jj. June 9, 2025 (The Corruption Notice & Evidentiary Strike): Plaintiff submitted a comprehensive, multi-layered Evid.R. 201 Consolidated Motion for Immediate Adjudication of Due Process Violations, Mandatory Judicial Notice of Systemic Governmental Malfeasance, and Compulsory Evidentiary Hearing on Damages **(Fed. Exh. 27)**. This formal submission placed uncontradicted evidence on the judicial record documenting the fundamental collapse of the Ohio constitutional compact, citing specific instances of pervasive institutional lawlessness, including: (a) the state's aggressive statutory expansion to authorize hydraulic fracturing within constitutionally protected State Parks despite documented 99% public opposition; (b) the open, bad-faith refusal of political leaders to adhere to supreme court orders declaring partisan gerrymandering unconstitutional; and (c) the multi-billion-dollar "House Bill 6" (HB6) bribery and racketeering scheme orchestrated by utility executives and state political leadership.

kk. June 10, 2025 (The Institutional Shield & Judicial Abdication): Within about 24 hours of Plaintiff's formal disclosure of systemic corruption, the Tenth District panel issued a lightning summary dismissal of the mandamus action **(Fed. Exh. 28)**. This extreme procedural celerity creates a clear inference of institutional collusion designed to insulate OPERS from responding to verified allegations of record-purging and fiduciary default.

 i. In a complete abdication of its judicial function, the panel safely shielded the administrative enterprise by completely disregarding the uncontradicted

evidentiary record, abandoning the mandatory notice pleading standard of review, and ignoring the strict structural limits of magistrate authority under Ohio Civ.R. 53.

ii. Constitutions exist to govern and limit governments; governments exist to govern people; and when an administrative enterprise's highest management ratifies the sanitization of a public record to cloak an illicit transaction, the state-court process suffers a terminal structural collapse, satisfying the threshold for plenary federal intervention.

iii. By rushing to moot all pending forensic motions, the Tenth District effectively ratified the Defendants' bad-faith maneuvers and imposed appellate costs upon the Relator as a final act of hostility—a pre-calculated judicial result made possible only through a coordinated effort to sanitize the record and execute a terminal collapse of appellate due process.

iv. This procedural celerity establishes a clinical command structure actively deploying corporate attrition models to insulate the agency from judicial review. Constitutions exist to govern and limit governments; governments exist to govern people; and when an administrative enterprise's highest management ratifies the sanitization of a public record to cloak an illicit transaction, the state-court process suffers a terminal structural collapse, satisfying the *Monell* threshold for plenary federal intervention.

v. June 18, 2025 (The High Court Entry and Appellate Cost Sanction): The Tenth District paneled its final Judgment Entry (**Fed. Exh. 28A**), which summarily mooted all pending forensic motions and fiduciary breach allegations without a

46

single moment of substantive review. Rather than confronting the raw merits of the uncontradicted certified record, the tribunal elected to insulate the administrative enterprise by extinguishing the case entirely on technical, non-meritorious grounds. To finalize this systemic containment, the court went so far as to impose all appellate court costs upon the truth-telling beneficiary—a calculated exercise of administrative hostility designed to penalize a member of the Bar for invoking the public interest and to structurally discourage further judicial inquiry into the state's data-sanitization protocols.

ll. June 27, 2025 (The Appellate Strike & Constitutional Notice): Relator submitted a formal Notice of Appeal and a Preliminary Statement of Constitutional and Public Interest Issues to the Supreme Court of Ohio (**Fed. Exh. 29**). This clinical filing codified the pervasive due process failures and fiduciary defaults occurring within the lower tribunals, providing the high court with a forensic summary of the institutional malfeasance and unconstitutional asset sequestration accrued to date.

mm. Early July 2025 (The Institutional Notice & Refusal): July 7–16, 2025 (The Final Executive Notice & Administrative Evasion): Plaintiff initialized formal outreach to ODC executive leadership, clinically documenting the accrued due process failures and providing definitive title directives for the ultimate conveyance of sequestered assets. Rather than rectifying these fiduciary defaults, Executive Director Lauren Gresh issued a July 7, 2025, electronic missive to various legislative members, audaciously minimizing this systemic constitutional challenge as a personal grievance. Notably, the enterprise again utilized a misspelled iteration of the undersigned's name—a clinical tactic designed to facilitate future discovery evasion (**Fed. Exh. 30**).

47

i. July 15, 2025 (The Certification of a Sanitized Record to the Supreme Court of Ohio): The Franklin County Clerk of Courts certified and transmitted a sanitized electronic record in Case No. 24AP-432 to the Supreme Court of Ohio under Supreme Court Case No. 2025-0850. This transmission deliberately excised Federal Exhibit 19—the dispositive "Lulling Letter" that conclusively establishes the agency's unconstitutional administrative notice and hearing protocols.

ii. This affirmative act of record spoliation directly insulated the state's appellate courts from reviewing the primary fraudulent instrument animating this dispute. Forensic analysis of the digital index confirms that neither the Tenth District nor the Supreme Court of Ohio were permitted access to this critical evidentiary payload. By stripping the appellate record of its central, self-authenticating proof, state actors engineered a structural collapse of appellate due process, rendering all subsequent judicial entries in this matter void *ab initio*.

iii. By July 16, 2025, Plaintiff provided comprehensive forensic notice of this systemic institutional collapse to ODC leadership, Statehouse officials, and the Governor's staff, finalizing the total exhaustion of all available executive and administrative remedies. Defendants cannot assert a failure to exhaust administrative remedies when their own digital portal infrastructure and systematic misrepresentations have rendered those remedies structurally unavailable.

iv. Under the controlling framework established in *Ross v. Blake*, 578 U.S. 632, 643-44 (2016), a litigant is entirely excused from exhaustion mandates when administrative actors utilize procedural machinations, misrepresentations, and

48

asymmetrical informational control to consciously thwart the challenger's ability to navigate the process. Here, the hard-coded suppression of transaction registries, paired with the subsequent data-wiping admissions, creates an insuperable information deficit designed exclusively to trap the citizen in a perpetual administrative loop. To require exhaustion under a closed system built on active deception is an inherent fallacy that subverts the Due Process Clause of the Fourteenth Amendment, transforming the state-court process into an exercise in structural futility. See *Gibson v. Berryhill.*

v. The Inherent Judicial Power to Penalize Extra-Court Fraud and Record Sanitization: When a state administrative apparatus engages in a coordinated campaign of record destruction and subsequent appellate deception, the federal courts are armed with an expansive, non-statutory authority to vindicate judicial integrity. Under the landmark framework established by the United States Supreme Court in *Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991), a federal court possesses absolute inherent power to control the parties before it and levy severe, system-wide financial and evidentiary sanctions when a litigant has acted in bad faith, vexatiously, wantonly, or for oppressive reasons.

vi. The *Chambers* Court explicitly ruled that this inherent authority is not displaced or restricted by localized procedural rules (such as Fed. R. Civ. P. 11 or 28 U.S.C. § 1927), and it specifically extends to penalizing fraudulent, extra-court machinations designed to degrade the judicial system or deprive a court of a complete record.

49

vii. The Chambers Threshold and the Structural Synergy of the Coordinated Enterprise: Here, the behavior of the Defendants, their active confederates, and their informational dupes mirrors the exact threshold of systemic defiance punished in *Chambers*. Because of the acute informational asymmetry engineered by the state and the calculated bad faith underlying their corporate containment model, the precise internal mechanisms of this enterprise were hidden from view. However, the record speaks for itself with unassailable forensic clarity.

viii. The division of labor within this litigation containment ring is stark: the Franklin County Clerk systematically scrubbed and sanitized the Tenth District appellate record; the principal defendants intentionally waited for a factually misled tribunal to issue an un-reviewed *per curiam* ruling before presenting their manufactured preclusion narratives; and institutional actors physically destroyed primary, signed contract documents. When confronted with these self-authenticating defaults, the enterprise deployed a series of frivolous procedural motions to entirely avoid their non-delegable statutory duties. Whether acting as calculating architects or as guileless, subordinate dupes executing an opaque administrative protocol, every participant within this defensive matrix operated in synergy to block judicial review and create an open-ended float. Because standard rules and statutes are inadequate to capture the full scope of this institutional decay, this Court must invoke its inherent power under *Chambers* to pierce the fraud, strike the defensive pleadings in their entirety, and penalize the deployment of these non-existent structural narratives.

50

nn.  August 12, 2025: Plaintiff submits his Merit Brief (**Fed. Exh. 31**) to the high court, documenting the dual-application trail (**State Exh. F, G**) and the forensic exposure of the manufactured timeline.

oo.  August 20, 2025 (The Settlement Renunciation & Sovereign Demand): In a direct operational encounter with Henrique Geigel, the administrative enterprise again audaciously asserted that the solitary mechanism for accessing vested property is absolute submission to OPERS' arbitrary, extra-statutory will. Within this dialogue, the undersigned established a dual-pronged threshold for any potential resolution: first, the comprehensive clinical restoration of both personal and professional interests; and second, the non-negotiable satisfaction of the broader public interest to remedy the systemic institutional default. OPERS summarily rejected multiple clinical attempts to initialize a formal settlement framework, resulting in a total operational stalemate. To expose the economic motives driving this administrative latency, Plaintiff initialized a formal renewal and clinical expansion of all discovery demands, specifically targeting the forensic disclosure of the accrued billable hour metrics and institutional compensation ledger of OPERS' outside defense network.

pp.  September 10, 2025 (The Merits of Deception and Institutional Defiance): Defendant OPERS submitted its Merit Brief (**Fed. Exh. 32;** State Court Record Case No. 2025-0850), perpetuating a matrix of material misrepresentations by falsely asserting that the un-promulgated notary instrument was transmitted to the Relator on May 28, 2024. This narrative is clinically rebutted by the record, which confirms that no such notice existed until June 26, 2024. In a tactical maneuver of administrative latency, the

51

enterprise summarily disregarded the primary February contract application, recognizing that no lawful defense exists for its accrued defaults.

i.  This defensive narrative relies entirely upon shifting timelines and factually bankrupt legal pretexts. In a transparent attempt to justify its unauthorized, extra-statutory "Notary Protocol," the agency audaciously argued that it possessed the administrative authority to mandate a third-party signature verification, and that Relator simply failed to meet them. This assertion flatly misrepresents controlling Tenth District jurisprudence under *State ex rel. Davis v. OPERS*, which expressly held that post-employment notary barriers imposed upon departing public servants are illegal. Seeking to distract the tribunal from its clear, non-delegable ministerial mandates, the agency deployed a sequence of classic red herrings, remarkably claiming that nothing within its enabling statutes could force a parallel state entity like ODC to execute a rollover. Furthermore, the defense cross-referenced its own internal, unauthenticated May 28, 2024 transaction ledger, claiming a rapid electronic transmission while deliberately withholding the primary metadata and corresponding email records that would verify the communication trail. The structural reason for this data suppression is clear: the defense network recognizes that if their baseline administrative timeline is subjected to forensic scrutiny, their entire containment model collapses.

ii. On page 8, OPERS audaciously attempted to reposition itself as the absolute master of the beneficiary, claiming all capital migrations must occur exclusively on institutional terms—a position at direct, violent odds with its non-discretionary fiduciary obligations. Most damaging to the enterprise, the agency explicitly

52

conceded its sweeping statutory fiduciary duties to beneficiaries, yet attempted to evade liability by paradoxically arguing that the underlying transaction was not "complete" simply because the agency chose to omit its own ad hoc notarization policy from the face of the official application forms. The record speaks for itself. An administrative agency possesses zero statutory authority to invent an un-promulgated, textually non-existent, two-step application matrix designed exclusively to delay capital access, generate unauthorized float reserves, and deprive citizens of their vested property entitlements.

iii. Operating in bottomless bad faith to cloak this asset conversion, the enterprise offered a legally absurd analogy, equating its unpublished notary barrier to standard airport security checkpoints, and labeling the Relator's constitutional objection to their arbitrary rule as an attempt to clear an FAA terminal with a mere fishing license, notwithstanding the total absence of physical jeopardy in a ministerial financial transfer. To sustain this administrative fiction, the defense was forced to argue that the General Assembly did not mean what it plainly and unambiguously stated through the mandatory statutory directive that the system *shall* disburse funds upon a member's separation from service.

iv. By page 12, the enterprise remarkably argued that no legal right exists to access these assets, deliberately ignoring the integrated mandates of the Constitution, state statutes, and the sovereign compact of trust law. In a brazen attempt to shield its operational hubs from federal judicial oversight, the agency characterized the Relator's precise, rule-governed request for the production of the core binding contractual instruments as a speculative "fishing expedition"—effectively

53

ignoring the Ohio Rules of Civil Procedure and glossing over the profound constitutional due process violations that the state courts chose to bypass. This calculated evasion, combined with the physical destruction of primary contract documents, triggers an irrebuttable adverse inference: the state compliance network was forced to suppress the true forensic record because an honest disclosure would expose the fact that multiple high-level institutional actors are actively participating in a coordinated financial containment scam.

qq. September 24, 2025 (The Evidentiary Exposure and Unrebutted Fraud Rebuttal): Plaintiff/Relator submitted his formal Supreme Court Reply Brief (**Fed. Exh. 33;** State Court Record Case No. 2025-0850), anchoring his entire dispositive rebuttal to Exhibit H—a certified affidavit detailing attached email communications dated June 26 and June 27, 2024, from OPERS to the Relator. This certified instrument permanently dismantled the agency's fabricated administrative timeline, serving as conclusive, objective proof of material misrepresentations deliberately presented to the Supreme Court of Ohio. The clinical binary now before this Court permits no middle ground: either OPERS has directly lied to the state judiciary to preserve an illicit capital asset conversion, or the Relator has committed perjury—a reckless counter-narrative that not even the defense has the audacity to contend is true.

    i. The Deflection of Factual Confrontation: While Defendant OPERS built its entire defensive framework on the unauthenticated assertion that its extra-statutory "Notary Protocol" was electronically transmitted to the Relator on May 28, 2024, Exhibit H establishes that no such notice or regulatory barrier was ever conveyed until nearly a month later. Prior to filing this brief, counsel for the undersigned

54

provided formal notice to counsel for OPERS several days in advance, offering a professional window to correct their material misrepresentations to the high court. Although counsel for OPERS explicitly acknowledged receipt of this correspondence, they completely refused to engage with the underlying substance of the timeline contradiction, electing instead to maintain absolute clinical silence before the tribunal. Under these circumstances, Plaintiff's professional oath required providing the high court with formal notification of the irreconcilable factual fraud standing on the record.

ii.  The Intentional Structural Opacity of the Protocol: Crucially, the extreme layers of administrative complexity required to locate and navigate this unpublished protocol do not represent an accidental oversight or a benign systemic defect. This structural opacity is a deliberate, engineered component of the system designed exclusively to mask the agency's operational footprints and obscure its breadcrumbs of corruption. By burying an extra-statutory, multi-million-dollar fund-containment barrier beneath un-promulgated administrative tiers, the enterprise intentionally cultivated a severe informational asymmetry. This architecture ensured that ordinary beneficiaries remained structurally blind to the unauthorized float mechanisms stripping them of their assets, while concurrently providing the compliance network with an insulated, closed-loop environment to execute record sanitization with perceived civil immunity. This calculated misdirection serves as a definitive fraud marker and plain evidence of a consciousness of guilt.

iii. The uncontradicted chronology established by Exhibit H demonstrates that the Tenth District fundamentally erred by disregarding mandatory notice pleading standards and denying both substantive and procedural due process. See *Conley v. Gibson*, 355 U.S. 41 (1957). Because Defendant OPERS failed to submit any competent metadata, transmission logs, or verifiable correspondence to sustain its May 28 narrative, a clinical adverse inference is mandatory to address this administrative manipulation and the concurrent spoliation of tracking data. See *Adkins v. Wolever*, 554 F.3d 650, 652 (6th Cir. 2009). Despite being presented with unassailable proof of this chronological fraud, counsel for ODC chose to maintain absolute silence, leaving the state's coordinated, extra-statutory asset containment model completely exposed.

rr. November 4, 2025: Relator formally issues a clinical litigation hold and demands notice to ODC executive leadership to secure the digital infrastructure and preserve the remaining evidence of institutional malfeasance.

ss. December 19, 2025 (The Conclusive Transactional Defeasance and Collateral Estoppel): The operational collapse of the defense network was definitively codified when Defendant ODC executed a direct capital conveyance of $50,000.00 into Plaintiff's personal financial account. In an irreconcilable, self-authenticating contradiction, ODC processed and cleared this financial transfer without any demand for the un-promulgated notary hurdle. This transaction completely explodes the defense's baseline pretense, establishing a clear collateral estoppel against their subsequent assertions that the notary protocol was a mandatory, non-waivable security requirement.

i. The Destruction of the Regulatory Pretext: This unilateral capital transfer proves that the primary application received by ODC on February 28, 2024, was fully actionable, procedurally mature, and legally ready for immediate execution. Because ODC was already in possession of Plaintiff's explicit waiver of any additional administrative processing—and because both agencies have formally admitted to a strict statutory fiduciary duty of care—the processing of this specific $50,000.00 conveyance without a third-party signature certification permanently eviscerates their defensive rationale.

ii. The Absolute Operational Default: By executing the transfer on identical administrative terms to those they spent months claiming were a threat to systemic financial security, the Defendants have forensically documented their own bad faith. They have proved on the face of the transactional ledger that the notary protocol is not a security measure, but an arbitrary, ad hoc containment barrier deployed exclusively as a tool of economic attrition. Having shattered their own administrative fiction through their own operational conduct, the defense is left completely disarmed on the merits.

iii. Crucially, this asset transfer was processed, approved, and authorized by Defendants completely absent any demand for the un-promulgated "Notary Protocol." By executing this high-value transaction on the identical administrative terms that they spent months claiming were a threat to systemic identity security, Defendants have forensically documented their own bad faith on the face of the transactional ledger. Because this waiver was executed directly for the benefit of this specific household unit, Defendants are individually and

57

judicially estopped from asserting that their unpublished notary protocol is a uniform, mandatory, or non-waivable security checkpoint against these exact individual Plaintiffs.

tt. Late 2025 – Early 2026 (The Systematic Closure of Administrative Safeguards): Concurrently with the high-court appeal, Plaintiff uncovered structural purges within the state databases and initiated a series of formal whistleblower submissions to exhaust all possible administrative and state-level remedies. The response across the entire state compliance apparatus confirms a total, systemic collapse of constitutional oversight, establishing that the avenues for state relief are entirely non-operational and futile:

   i. The Auditor of State Deflection: A verified fraud complaint was filed directly with Auditor Keith Faber. Rather than initiating an immediate forensic review, the Auditor's department executed a six-week administrative vacuum, purposefully "scrubbing" the tracking log to obscure the receipt of the filing (**State Exh. J-1**). The Auditor subsequently admitted that these systemic complaints were merely routed into a standard, slow-cycle line audit, effectively delaying any meaningful fiscal investigation for months or potentially years.

   ii. The Department of Administrative Services (DAS) & Inspector General Blockade: Formal disclosures were filed with DAS establishing that OPERS and ODC systematically failed to secure mandatory record-retention authorizations from the State Records Program prior to purging their financial transaction logs. These filings were met with an absolute, coordinated communications blackout. To ensure no regulatory duty to investigate was triggered on the state record, the

58

Ohio Inspector General's intake and referral lines were rendered non-operational to intercept and neutralize the incoming payload.

iii. The Prosecutorial Default: The Franklin County Prosecutor's Economic Crimes Division was presented with direct proof of systemic white-collar asset conversion and records spoliation within these state agencies. The Prosecutor's office summarily disclaimed any statutory duty to investigate, confirming that the county's law enforcement apparatus serves as a passive shield for institutional actors.

iv. The Futility of Administrative Exhaustion: While Plaintiff possesses devastating rebuttal evidence ready for federal introduction, this administrative chronology is presented as a structural roadmap demonstrating that Plaintiff went to extreme lengths to exhaust every conceivable state-level channel. The uniform, bad-faith stonewalling executed by the Auditor, the Inspector General, and the Prosecutor confirms a total collapse of due process within the state's regulatory framework, satisfying the absolute futility exception for federal intervention. When every domestic checkpoint is intentionally disabled to cloak an illicit administrative float, an injured citizen has an absolute right to bypass the compromised state forum entirely. See *Gibson v. Berryhill*, 411 U.S. 564, 575 (1973).

uu. January 9, 2026 (The Parallel Enforcement Strike): Plaintiffs, Amy N. and Cory A. Haydocy, Esq., initialize a primary trial-court civil enforcement action within the Franklin County Court of Common Pleas (Case No. 26CV000311) before Judge Holbrook, formally alleging Systemic Fiduciary Breach, Structural Evidence Spoliation, and Tortious Conversion. This clinical filing integrated a Preliminary Notice of First Set

of Discovery Requests and a Motion for Declaratory Judgment and Mandatory Injunctive Relief (**Fed. Exh. 34***)*. Incorporated therein were dual verified affidavits from Plaintiffs Cory and Amy Haydocy and a forensic evidence packet including: Exhibit A-1, the primary February 2024 rollover instrument; Exhibit A-2, the May 28, 2024 submission; and Exhibit A-3, the July 8, 2024 ODC admission. Exhibit A-4 provides a chronological ledger of written communications wherein ODC representatives explicitly confirmed both the functional completeness and the subsequent administrative destruction of the operative contract (**State Exh. A-4.11**).

vv. January 12, 2026 (The Strike for Declaratory Judgment and Injunctive Relief): Plaintiff filed a comprehensive Motion for Declaratory Judgment and Permanent Injunctive Relief (**Fed. Exh. 35**), invoking R.C. 2721.03 to permanently halt the Defendants' extra-statutory fund-containment apparatus. This filing documented that ODC had already explicitly admitted both its non-discretionary fiduciary duties and its total operational default, including the systematic destruction of core financial records.

i. The Exploitation of the Beneficiary Class: The motion laid bare the predatory mechanics of the enterprise, exposing the ongoing, illegal sequestration of capital as a calculated corporate policy. Operating as structural bullies, ODC and OPERS deliberately deploy aggressive, multi-tiered litigation tactics designed to exhaust individual beneficiaries through financial and procedural attrition. The defense network builds its entire revenue model on a cruel, asymmetric calculation: knowing that everyday citizens lack the thousands of dollars in capital required to legally fight a state agency, they weaponize delay until the victim is forced to capitulate to their arbitrary, un-promulgated rules out of pure economic survival.

60

ii. The Scope and Motive of the Float: Plaintiff permanently codified on the record that administrative submission under duress is not proof of regulatory legality; rather, it is a definitive marker of the scope and predatory motive of the enterprise. The state compliance apparatus deliberately manufactures these extra-statutory barriers to hold millions of dollars in captive beneficiary capital, generating massive, unauthorized float reserves to fund institutional growth at the direct expense of the vulnerable citizens they are under a strict fiduciary mandate to protect. By exposing this continuous pattern and practice of institutional extortion, the filing established that immediate judicial intervention is the only remaining mechanism to protect the public interest from a rogue bureaucracy motivated entirely by money, power, and unchecked administrative greed.

ww. Winter 2026 (Sovereign Capture and Ethics Weaponization): The state's structural suppression of accountability is further evidenced by the protection of those exploiting state parks. Building on June 2025 evidence showing authorized fracking in sanctuaries despite constitutional bans and 99% public opposition—revealed by the Relator's service as Executive Director of the Oil and Gas Commission (2019–2023)—Washington County for Safe Drinking Water filed a JLEC ethics complaint against Senate Energy Chairman Brian Chavez. The filing detailed self-serving conflicts and regulatory overhauls designed to shield toxic waste infrastructures.

i. These citizens acted to protect their generational water supply from contamination. Rather than allowing an investigation into radioactive brine migrations from Chavez-led entities, legislative leadership deployed a

61

taxpayer-funded media strategy to insulate him. The Senate Majority unhingedly castigated these whistleblowers as "elitist" and "dishonest" agents (**Fed. Exh. 35A**).

ii. The state then weaponized administrative technicalities to declare the complaint "meritless," ignoring prior regulatory suspensions of Chavez's wells for leakage. This bad-faith containment mirrors the labyrinth constructed against the Relator to bury institutional corruption and protect financial parasites.

xx. January 28, 2026: Plaintiffs' Combined Motion and Reply (Case No. 26CV000311) (**Fed. Exb. 36**); Filed on January 28, 2026, this combined motion asks the Franklin County Court of Common Pleas for an immediate Default Judgment (Civ.R. 55) or, alternatively, Summary Judgment (Civ.R. 56), while serving as a formal Notice of Criminal Referral against the ODC/OPERS defense network.  Because the Defendants completely blew their deadline to file a timely response under Civ.R. 6(C), the evidentiary record stands entirely uncontested. The filing lays out a clear, multi-layered breach of fiduciary duty under R.C. 148.04. It proves that the agency intentionally locked up and delayed the rollover of vested 457(b) private property—which is guaranteed as "inviolate" under Ohio Const. Art. I, Sec. 19—simply to pad ODC's own 13-month operating cash reserves in a predatory, rent-seeking float scheme.

i. The fatal blow to the defense is their own admitted record destruction. On January 21, 2025, the Defendants formally admitted to the "non-retention" of the critical July 2024 transaction logs. Because the Department of Administrative Services (DAS) and the Auditor of State verified that the agency never secured a mandatory RC-3 Certificate of Disposal (R.C. 149.333), the filing establishes a

62

mandatory adverse inference of bad faith under *Smith v. Howard Johnson*. They chose the shredder over compliance to hide an illegal asset-containment agenda.

ii. Finally, the motion unmasks the agency's January 16, 2025 "Notice of Non-Oral Hearing" as a classic procedural artifice—the exact equivalent of a federal mail fraud lulling instrument (18 U.S.C. § 1341)—deployed to fake a narrative of due process while keeping the board insulated from forensic scrutiny. Plaintiffs are asking the Court to pierce all immunity defenses under R.C. 2744.03 and issue a permanent injunction ordering the immediate, unconditional transfer of their captured funds.

yy. February 3, 2026: Defendant ODC submits a formal Motion for an Extension of Time (**Fed. Exh. 37**). This filing represents a calculated, dilatory tactical maneuver, predicated upon a legally insupportable narrative and engineered exclusively to perpetuate institutional latency and obstruct the timely administration of justice.

zz. February 5, 2026 (The Shielding of Default and Exposure of the Attrition Playbook): Plaintiff filed a formal Memorandum in Opposition to Defendant's Motion for Extension of Time and Motion for Abeyance (**Fed. Exh. 38;** State Court Record Case No. 26CV000311), systematically dismantling ODC's tactical deployment of a "Delay, Deny, Defend" attritional playbook. This filing unmasked the true urgency of the pending preliminary injunction, framing the state's continuous, unauthorized retention of 457(b) assets as an active, hostile conversion—a financial hostage situation where every day of judicial inaction directly rewards the bad-faith spoliator.

i. The Collapse of Procedural Evasion and Deemed Admissions: The memorandum shattered ODC's "service evasion" defense as a legal absurdity, documenting that

63

the motion was served directly upon the agency's active Counsel of Record before the state attempted to play "musical chairs" with its assigned Assistant Attorneys General. Plaintiffs noted that even under the agency's self-serving timeline calculation, their response window under Local Rule 21.01 had expired, locking them into a terminal procedural default.

ii. Crucially, the filing established that the agency's quiet panic and structural silence in the face of document destruction claims could not serve as a civil sanctuary; their latent Fifth Amendment problems are not the Plaintiff's problems, and a constitutional privilege against self-incrimination cannot be weaponized as a procedural shield or a "stay of proceedings" button to rescue a rogue fiduciary.

iii. By exposing this calculated evasion, the filing robustly objected to any request for an abeyance, demonstrating that ODC only sought to stay the judicial machinery so it could "investigate" records it had already admitted to not retaining. The submission stood as a definitive record that administrative grace cannot be extended to a state compliance network that uses manufactured procedural blind spots to maintain an interest-free operating float while treating the Civil Rules of Procedure with absolute, derisive contempt.

iv. Consequently, the memorandum enforced a devastating Statement of Deemed Admissions arising directly from the defense network's default. By maintaining an absolute silence on the merits, the enterprise legally and irrevocably conceded the following foundational elements of the fraud matrix:

1. Receipt and Contractual Validity: Admitting that ODC received the fully completed, procedurally mature Rollover Application on February 28,

64

2024, eliminating any manufactured pretext that paperwork was "missing" or "incomplete."

2. Non-Discretionary Ministerial Duty: Conceding that the agency possessed a mandatory legal obligation to process the transfer immediately upon receipt.

3. The Calculated Lulling Period: Admitting that institutional actors intentionally engineered a 130-day administrative blackout specifically to suppress Plaintiff's property rights and buy time for record destruction.

4. Willful Spoliation: Conceding that ODC completely failed to retain physical or digital logs of the transmission to OPERS, a reality cemented by DAS confirming the total absence of mandatory RC-3 Certificates of Disposal.

5. Civil Conversion and Compounding Market Injury: Establishing that the enterprise exercised unauthorized dominion over vested private property, directly triggering the damages phase for a continuous 575-day period of illegal capital detention.

aaa. February 2, 2026 – February 11, 2026 (The Exhaustion of Law Enforcement and Systemic Prosecutorial Refusal): Plaintiff documented the total failure of the state's criminal justice apparatus by submitting a chronological chain of formal disclosures, whistleblower reports, and criminal referrals to every relevant enforcement agency in the jurisdiction (**Fed. Exh. 39**). The resulting record confirms a fundamentally broken system where institutional actors deliberately rely on circular jurisdictional

65

buck-passing to insulate white-collar public corruption and avoid their statutory obligations. The timeline of this systemic collapse tracks as follows:

i. February 2, 2026 (The Initial Economic Crimes Disclosure): Plaintiff transmitted a detailed criminal referral directly to Jason Moore, Director of the Economic Crimes and Public Corruption Division in Franklin County. The disclosure provided formal qualification and bar credentials, laid bare the predatory nature of the extra-statutory "Notary Protocol" as a flagrant dereliction of the public trust, and cross-referenced active public court filings detailing a pervasive pattern of fiduciary fraud, civil conversion, and organized corrupt activity.

ii. February 6, 2026 (The Jurisdictional Evasion): Economic Crimes Director Jason Moore issued a formal response refusing to take any immediate action on the referral. The division asserted that it is procedurally "unable to act" on complaints of systemic white-collar crime within state agencies until an independent investigation is first completed and handed over by a traditional law enforcement agency or another state-level investigative bureau.

iii. February 9, 2026 (The Comprehensive Whistleblower Matrix and Coordinated Blackout): Refusing to accept this administrative stalemate, Plaintiff aggressively expanded the referral matrix to activate every conceivable state and local enforcement avenue. On this date, Plaintiff concurrently served the City Attorney of Columbus, the Ohio Inspector General's intake bureau, and the Franklin County Prosecutor with an exhaustive Disclosure of Wrongful Acts. This final payload contained a formal Whistleblower Report, an Anti-Retaliation Notice, a

comprehensive Referral of Criminal Activity, and a demand for Mandatory Written Cooperation under the rules.

iv. The Escalation of Record Evaporation and Fraudulent Concealment: The true depths of this institutional rot were permanently codified between February 10 and February 11, 2026, when Plaintiff attempted to hold the state's highest oversight bureaus accountable for their sudden, highly selective data manipulation. On February 10, 2026, the Ohio Inspector General's office belatedly rejected electronic service of Plaintiff's comprehensive criminal disclosure—a bad-faith maneuver designed entirely to avoid generating a digital transmission log with the goal of escaping any formal duty to confirm receipt or initiate a mandatory investigation.

v. February 11, 2026 (The Formal Notice of Material Omission to the Auditor): Compounding this blockade, Plaintiff was forced to transmit a formal Clarification and Notice of Material Omission directly to Auditor of State Keith Faber on February 11, 2026 (**Fed. Exb. 40**). This urgent filing unmasked the reality that the Auditor's department had entirely excised and scrubbed all traces of Plaintiff's prior December 16, 2025 formal fraud complaint from their official records.

vi. This clinical erasure presents the state network with an unresolvable binary dilemma: either the Auditor of State and the Inspector General are suffering from pervasive, systemic operational incompetence, or they are actively scrubbing public databases and destroying tracking trails to insulate their criminal confederates from forensic scrutiny. There is zero middle ground and no innocent

67

explanation. Whether driven by terminal regulatory negligence or a coordinated consciousness of guilt, the state compliance network deliberately erased the evidentiary record to protect its financial parasites, rendering the entire state oversight apparatus an absolute, dangerous sham.

bbb. February 12, 2026 (The Recycled Pleading Matrix and Coordinated Fiduciary Defiance): Defendant ODC, acting through the Ohio Attorney General, submitted a recycled Motion to Dismiss in lieu of an Answer (**Fed. Exh. 41;** State Court Record Case No. 26CV000311), expanding its administrative float strategy by playing bad-faith semantic games designed to insulate the enterprise from forensic review. In this submission, the state compliance network relies on a series of irreconcilable legal contradictions that effectively paint the agency as structurally incompetent and unfit to serve as a statutory fiduciary. On page 3, the agency asserts that the under-signed "botched" the initial capital migration process, yet completely fails to define what was procedurally defective about the submission, choosing to gloss over the fact that the Relator meticulously executed the agency's own official, published instruments.

   i. The Fabricated Timeline and Fraudulent Data Markers: To sustain its narrative of consumer non-compliance, the defense attempts to bypass the uncontradicted evidentiary payload contained within Exhibit H. On page 8, the agency points to an automated, un-promulgated digital timestamp of "May 28, 2024" as definitive proof of rapid administrative notice, falsely claiming that documentation was immediately transmitted. However, the agency provides zero metadata or correspondence logs to sustain this claim. This automated stamp stands on the record as a definitive fraud marker rather than a binding administrative signature,

68

completely failing to rebut the certified proof that the "Notary Protocol" notice was deliberately withheld until late June.

ii. The Collusion Signal and Misuse of Preclusion Narratives: Operating in total structural synergy, the motion reveals that ODC is actively executing defensive legal work on behalf of OPERS, using the same state counsel to act as a shield for both hubs of the enterprise. The defense audaciously argues that the doctrine of *res judicata* applies to this litigation, seeking to rely on the fundamentally voidable, un-reviewed *per curiam* decision of the Tenth District Court of Appeals. This preclusion narrative is legally absurd. *Res judicata* cannot insulate an entirely separate statutory entity from an independent action for breach of fiduciary duty and civil conversion—especially when that entity has formally admitted on page 11 that the Plaintiff's intent to transfer the assets is entirely undisputed, while concurrently admitting to the unlawful destruction of the dispositive transmission evidence.

iii. The Defeasance of Statutory Accountability: By page 7, the agency drops all pretense of objective regulatory stewardship, explicitly declaring that all capital migrations must occur solely by submitting to the absolute administrative will of ODC and OPERS. The motion concludes by remarkably asserting that the Court lacks the authority to enforce R.C. 148.04 and that ODC is entirely insulated from civil liability outside of a highly restrictive mandamus framework. This calculated position effectively states that the state compliance network is entirely above the law, that its unconstitutional fund-sequestration protocols are unreviewable, and that injured beneficiaries have no remedy but to submit to an open-ended float. By

69

choosing to file a boilerplate Rule 12(B)(6) motion to avoid answering for certified record spoliation, the agency has forensically documented its own consciousness of guilt, transforming its responsive pleading into a clear marker of institutional bad faith.

ccc. February 17, 2026 (The Procedural Blockade and Defensive Cloaking of Spoliation): Defendant ODC, continuing its coordinated containment strategy via the Ohio Attorney General, filed a formal Motion to Stay and for Protective Order (**Fed. Exh. 42;** State Court Record Case No. 26CV000311). This instrument seeks a total structural shutdown of the civil discovery mechanism under Civ.R. 26(C), explicitly demanding that Plaintiffs' outstanding interrogatories, requests for production, and 20 requests for admissions "not be had" until the Court disposes of the agency's pending motion to dismiss.

i. The Weaponization of the Docket to Insulate Record Destruction: Stripped of its boilerplate veneer, the motion represents a calculated, bad-faith attempt to use the court's administrative machinery to freeze forensic inquiry and shield the enterprise from the immediate consequences of its own records destruction. The agency deploys this recycled Motion to Dismiss and Motion for Stay/Protective Order before Judge Holbrook, attempting to use a manufactured "insuperability pretext" to shield executive agencies from civil discovery, discovery consequences, and constitutional accountability. The agency audaciously argues that because it has asserted preclusion narratives and *res judicata* defenses anchored to the Tenth District's un-reviewed *per curiam* mandate, it is entitled to an absolute shield against civil discovery. This position exposes an

70

unconstitutional doctrine of self-conferred administrative immunity: the agency contends that it can systematically shred core transactional logs in violation of R.C. 149.333, file a recycled Rule 12(B)(6) motion, and then leverage that very motion to block the discovery requests designed to document the scope of their spoliation.

ii. The Engineering of Judicial Blindness: To justify this complete operational freeze, the defense mischaracterizes Plaintiff's rapid-fire pursuit of statutory compliance as a procedural overreach, framing the ongoing sequestration of 457(b) capital as a benign, unripened dispute that must await the Ohio Supreme Court's determination in Case No. 2025-0850. By demanding an absolute protective order while concurrently maintaining a terminal default on the merits, ODC effectively asserts that a state compliance network has the unchecked authority to engineer a complete informational blackout. This defensive maneuver is designed exclusively to preserve an unauthorized interest-free operational float, deny Plaintiffs their day in court, and force the judiciary to rule upon a manufactured, factually sanitized record—a terminal violation of civil due process that highlights a calculated consciousness of guilt.

ddd. February 18, 2026 (The High-Court Exposure of Record Sanitization): Relator filed an emergency Motion to Supplement the Record pursuant to S.Ct.Prac.R. 15.08 before the Supreme Court of Ohio under Supreme Court Case No. 2025-0850 (**Fed. Exh. 43**), documenting an acute fraud on the court executed by the state compliance network. This filing provided unassailable proof that the critical January 16, 2025 "Lulling Letters" (**State Exh. I-5, I-6**) were intentionally scrubbed, excised, and withheld from

71

the certified record transmission by the lower clerk infrastructure to conceal the reality that the Tenth District's underlying decision rested upon an unconstitutional, unsigned "phantom hearing." The gravity of this record manipulation is a definitive marker of institutional consciousness of guilt; a parallel review of the public docket index (**State Exh. I-7**) confirmed that this specific instrument was locked and hidden from public view to engineer absolute judicial blindness at the supreme court level. This calculated omission forensically unmasks an active, coordinated conspiracy between the lower clerk's office, OPERS, and ODC to sanitize the appellate record so that ODC could subsequently leverage a factually blind, voidable *per curiam* dismissal to evade separate fiduciary liability in parallel common pleas litigation. Confronted with this devastating exposure of systemic record tampering, the state actors mounted zero opposition, leaving their coordinated administrative fraud completely unrebutted before the state's highest tribunal.

eee. February 20, 2026 (Plaintiffs' Comprehensive Response in Opposition to Defendants' Motions): Plaintiffs filed a Comprehensive Response (**Fed. Exh. 44;** State Court Record Case No. 26CV000311**)**, consolidating the operative evidentiary record and answering Defendant ODC's outstanding motions. The submission frames the material issues through a detailed Statement of Undisputed Dispositive Facts and a Comparative Evidence Summary, establishing the following core components within the trial court record:

  i. The Operational Status of the Application and Fiduciary Scope: Plaintiffs introduced ODC's formal written communication dated January 21, 2025, which explicitly states that the primary February 26, 2024 transfer application was

received as "fully completed." Plaintiffs maintain that the mechanical execution of a procedurally mature capital rollover among qualified instruments functions as an absolute, non-discretionary ministerial mandate pursuant to R.C. 148.04. This statutory baseline strictly prohibits the post-vesting invention of internal administrative barriers—specifically the un-promulgated, extra-legal "Notary Policy"—to delay the migration of assets. Because the legal entitlement is vested and irrevocable, ODC maintains a non-delegable statutory duty to perform the requested conveyance immediately.

ii.  The Factual Pleading Matrix ("Who, What, When, and How"): The memorandum delineates the specific roles of the institutional actors (ODC and OPERS) and references procedural discrepancies within the administrative tracking infrastructure. It traces the chronology of the asset migration request, tracking the timeline from the initial February 2024 receipt through the subsequent months of administrative latency and the distribution of the January 16, 2025 hearing notices.

iii.  The Admission of Record Non-Retention and Statutory Implication: The response highlights ODC's formal acknowledgment that it did not retain the July 10, 2024 transmission log, an electronic record documenting communication with OPERS while under notice of potential litigation. Plaintiffs assert that this non-retention violates the mandatory records standards of R.C. 149.333 and R.C. 149.351, given the verified absence of an approved RC-3 Certificate of Disposal, thereby supporting a regular adverse inference under *Smith v. Howard Johnson*.

73

iv. Ubiquity is Not Legitimacy: Plaintiffs directly confront the defense network's historical reliance on institutional scale to justify its extra-statutory practices. The memorandum argues that the high volume or frequency of an administrative practice does not validate its legality; the numerosity of a constitutional deprivation across a vast participant base can never transform an unauthorized, extra-legal impediment into a constitutional operation.

v. Rebuttal to the Preclusion and Procedural Defenses: Plaintiffs' memorandum systematically addresses the legal sufficiency of ODC's Rule 12(B)(6) Motion to Dismiss. Plaintiffs contest the application of *res judicata* based on the Tenth District's prior mandamus ruling, asserting that a prior extraordinary writ action cannot bar independent common-law tort claims for intentional spoliation and fraud—particularly where the underlying appellate record is shown to be structurally incomplete due to the omission of the January 16, 2025 notice from the certified transmission.

vi. The Institutional Conflict and Opposition to the Motion to Stay: Plaintiffs oppose ODC's request for a total stay of proceedings and a protective order under Civ.R. 26(C). Citing established fiduciary principles and parallel litigation addressing pension board boundaries, Plaintiffs argue that a protective order cannot be deployed on an *insuperability pretext* to insulate a public entity from discovery regarding missing records.

vii. The filing further highlights an inherent institutional conflict of interest within the state's legal representation: the Ohio Attorney General's office is actively attempting to prosecute external pension systems for fraud within the very same

74

courthouse where it simultaneously acts as a defensive shield to insulate executive agencies from the operational consequences of their own document destruction and fiduciary defaults. Plaintiffs argue that this structural paradox underscores a profound failure of objective enforcement. Because the defense has failed to produce or identify any countervailing evidence across the primary categories of completeness, statutory duty, and document preservation, the entry of summary judgment and an advancement to a hearing on damages is procedurally required to preserve the integrity of the Civil Rules.

fff. February 23, 2026 (The Trial Court Procedural Dismissal and Enforcement of Deadlines): Judge Michael J. Holbrook of the Franklin County Court of Common Pleas issued a Decision and Entry denying Plaintiffs' Combined Motion for Default or Summary Judgment (**Fed. Exh. 45;** State Court Record Case No. 26CV000311). The court enforced a strict, hyper-technical timeline under the Civil Rules, ruling that because ODC was not formally served with the summons and complaint until January 20, 2026, Plaintiffs' January 28 motion was procedurally premature under Civ.R. 56 and that default judgment could not be sustained under Civ.R. 55 in this posture. While this entry applied a lenient standard toward ODC's timeline—overlooking that the underlying Motion for Declaratory Judgment had already been served upon active counsel well before January 20, 2026—this procedural dismissal is entirely non-dispositive on the merits. Rather than adjudicating the fiduciary breaches or record spoliation claims, the ruling functions as a standard administrative reset of the litigation runway; it remained an open question whether the local judiciary is operating under institutional bias or is simply holding the record in abeyance until the defense network

75

is legally compelled to emerge from its procedural hideout and file a verified answer on the merits.

ggg. March 3, 2026 (The Rule 26 Initial Disclosures and Target Matrix): Plaintiffs served their formal Civ.R. 26 Initial Disclosures directly upon counsel for ODC (**Fed. Exh. 46; State Court Record Case No. 26CV000311**). The disclosure formalized a precise forensic and testimonial matrix, identifying key institutional targets for deposition and discovery, including Board Chair Chris Mabe, Carolyn Hopkins, Ken Thomas, and Julia Nelson. This disclosure was executed before the projected March 6, 2026 discovery deadline calculated from the January 20 service date. Concurrently, this lower-court proceeding was provided formal notice of the unrebutted emergency S.Ct.Prac.R. 15.08 Motion to Supplement the Record currently pending before the Supreme Court of Ohio in Case No. 2025-0850.

    i. March 6, 2026 (The Expiration of the Discovery Window and Conclusive Admissions): The March 6, 2026 discovery milestone passed with Defendant ODC failing to respond, object, or secure a protective stay from the court regarding Plaintiffs' propounded discovery requests.

    ii. Because the agency completely blew past its mandatory obligations to answer the outstanding interrogatories, requests for production, and requests for admission, the central elements of the fraud matrix—including the February 2024 asset vesting metrics and the willful spoliation of the July 2024 transmission logs—became conclusively established as matters of law. By operation of Ohio Civ.R. 36, these unanswered matters are deemed admitted, permanently stripping

76

the state compliance network of its ability to contest liability or offer a merits-based defense moving forward.

hhh. March 10, 2026: (Plaintiffs' Omnibus Motion for Summary Judgment, Compulsion, and Judicial Notice): Plaintiffs filed a comprehensive Omnibus Motion seeking a Renewed Entry of Summary Judgment under Civ.R. 56, an Order Compelling Discovery and for Sanctions under Civ.R. 37, and an Order taking Judicial Notice under Evid.R. 201 (**Fed. Exh. 47;** State Court Record Case No. 26CV000311). This master submission establishes a total, self-executing procedural and substantive default by Defendant ODC. Because the agency elected to pursue a tactical "procedural gamble"—relying on its pending motion to dismiss and stay to unilaterally ignore date-certain deadlines without a court order in hand—its failure to respond to Plaintiffs' First Set of Discovery Requests by the March 6, 2026 expiration date permanently locked the enterprise into a terminal default. Under the controlling mandate of *Cleveland Trust Co. v. Willis*, the following seven critical facts are now Deemed Admitted and conclusively established as a matter of law:

i. Receipt of Vested Application: ODC received the fully completed February 2024 rollover application on February 28, 2024, which contained an explicit release of liability and immediate vesting markers.

ii. Administrative Spoliation: ODC failed to preserve the ODC-executed transactional transfer document and formally admitted to its "loss" on July 10, 2024, while under active notice of litigation.

iii. The Pretextual Reset: ODC coordinated a fraudulent "notary pretext" to retroactively reset Plaintiffs' vesting dates and shield the state from administrative mismanagement liabilities.

iv. Validity of Service: Plaintiffs properly and concurrently served the First Set of Discovery Requests alongside the Summons and Complaint by January 20, 2026.

v. The 45-Day Window: Pursuant to Civ.R. 36(A)(1), Defendant's mandatory timeline to respond expired on Friday, March 6, 2026.

vi. The Discovery Default: Defendant completely failed to serve any written answers or legal objections within the statutory window.

vii. The Conclusive Legal Effects: The defense network irrevocably conceded that it exercised unauthorized dominion over Plaintiffs' vested property and that its asset-migration duties are strictly ministerial rather than discretionary.

viii. The Unifying Theory of Systemic Concealment and Evidence Matrix: To aid the trial court's resolution, the motion outlines a definitive Master Chronology of Systemic Bad Faith mapping every key historical transaction from the original February 26, 2024 filing up to the March 10, 2026 motion. This timeline anchors the "Unifying Theory"—a four-pillar framework detailing how multiple public agencies operated in concert to *Delay* asset migrations via spoliation, *Defend* the concealment through legal sophistry and representation conflicts, *Deny* forensic trails using anonymous, digital walls, and *Destroy* records via lower-court clerical sanitization.

78

ix. To permanently cement this network of institutional concealment, Plaintiffs moved the court to take mandatory Judicial Notice of core, unassailable public records, attaching direct forensic exhibits to the omnibus filing:

1. The Auditor of State (AOS) Database Erasure: Plaintiffs submitted a certified page of the official AOS Fraud Log Report dated February 9, 2026 (**State Exh. J-1**), demonstrating an absolute database blackout and the total omission of Plaintiffs' formal December 16, 2025 fraud complaint from the statutory registry.

2. The Multi-Agency Criminal Referral: Plaintiffs logged their formal February 9, 2026 whistleblower disclosure and criminal notification served upon the Franklin County Prosecutor and regional investigative units (**State Exh. J-2, J-3**).

3. The Executive Intake Blackout: Plaintiffs provided a digital transmission record dated February 10, 2026 (**State Exh. J-4**), proving that the Ohio Inspector General's official intake server repeatedly timed out and rejected electronic service of the criminal referral to avoid creating a tracking log.

4. The Formal Audit Demand and Omission Clarification: Plaintiffs attached their February 11, 2026 formal notice to Auditor Keith Faber (**State Exh. J-5**), warning the office that its public log had been selectively scrubbed and curated in violation of R.C. 117.103. Concluding the omnibus presentation, Plaintiffs argue that because a public fiduciary has zero statutory authority to withhold vested property, destroy compliance records, or maintain an anonymous wall of silence, the defense is legally

79

powerless to offer an excuse. Plaintiffs demand an immediate entry of summary judgment, an order compelling the immediate turnover of unredacted metadata, and the escalation of the case to a formal hearing on sanctions and damages.

iii. March 23, 2026 (The State's Post-Facto Defensive Intervention and Res Judicata Narrative): The state compliance network attempted a post-facto intervention by filing a Memorandum Contra to Plaintiffs' Omnibus Motion (**Fed. Exh. 48;** State Court Record Case No. 26CV000311). In this submission, the Ohio Attorney General manufactures a narrative claiming that Plaintiffs already received a full "day in court" before the Tenth District appellate infrastructure. On page 2, the agency asserts that the underlying capital-migration controversy was fully resolved by the prior mandamus dismissal, characterizing Plaintiffs' separate common-law tort claims as an illicit attempt to circumvent binding precedent and "game the system."

    i. The Material Misrepresentations and Evasion of Governing Precedent: This defensive posture relies on acute material misrepresentations that are entirely unsupported by the physical record. The agency's assertion of a complete prior adjudication completely glosses over the fact that the Tenth District's *per curiam* mandate was a summary dismissal issued without an evidentiary hearing, without permitting discovery, and upon a demonstrably "scrubbed" record. Furthermore, the memorandum entirely ignores the controlling Tenth District precedent established in *State ex rel. Davis v. Public Employees Retirement Board*, which expressly dictates that administrative agencies lack the statutory authority to

80

manufacture extra-legal requirements—such as a retroactive notary mandate—to delay or withhold the distribution of a beneficiary's vested property.

ii. The Attempted Expansion of Mandamus Exclusivity: Operating on page 4, the state network attempts to construct a total jurisdictional shield by asserting a sweeping discovery exception. Relying on *State ex rel. Marchiano v. School Employees Retirement System*, the agency argues that because administrative retirement decisions are reviewable exclusively via mandamus, civil discovery under the Ohio Rules of Civil Procedure is entirely prohibited. This argument is legally bankrupt. The agency attempts to use a highly localized mandamus rule to block a common-law action for intentional spoliation and fraud—independent torts arising from the agency's own admitted destruction of the July 10, 2024 record. By choosing to launch an attack against the "relentless" nature of Plaintiffs' filings rather than producing the missing metadata or answering the self-executing Civ.R. 36 admissions, the state's memorandum confirms that the enterprise remains entirely without power to rebut the underlying fraud on the merits.

jjj. March 26, 2026 (The Motion to Strike and Formal Evidentiary Challenge): Plaintiffs filed a formal Reply in Support of their Omnibus Motion and a Motion to Strike Defendant's Memorandum Contra pursuant to Civ.R. 12(F) (**Fed. Exh. 49;** State Court Record Case No. 26CV000311). This submission targets the state's *res judicata* narrative as a legally meritless, scandalous fabrication. Plaintiffs issued an explicit evidentiary challenge on the record: if the defense network can produce a single page of a certified, due-process-compliant transcript proving that Plaintiffs were ever granted a

81

public, adversarial hearing on the merits, Plaintiffs will voluntarily dismiss the action. The agency's total silence in response to this challenge confirms that the narrative of a prior "day in court" is an absolute fabrication.

i. The Constitutional Minimum and the Fiduciary Shell Game: The motion invokes the baseline structural protections established in *Goldberg v. Kelly*, demonstrating that the Fourteenth Amendment's Due Process Clause mandates a meaningful pre-deprivation hearing, including the right to cross-examine adverse witnesses. The state's reliance on an unsigned, non-downloadable January 16, 2025 "Lulling Letter" to conduct an opaque, "phantom" non-oral vacuum completely fails to meet this constitutional minimum. Plaintiffs frame this ongoing obstruction as a secondary breach of fiduciary duty under R.C. 148.04; the agency is attempting to transition from a statutory trustee into an adversarial captor, weaponizing its own uncodified internal protocols and the "loss" of core transactional records as a jurisdictional shield to hold vested private property hostage under a false pretext of participant protection.

ii. The Immutability of the Self-Executing Default: The filing permanently records that the state's strategic choice to prioritize a failed jurisdictional gamble over clear procedural mandates has resulted in a final, incurable default. Under the controlling mandate of *Cleveland Trust Co. v. Willis*, the discovery process is self-executing. Because the March 6, 2026 window closed without ODC obtaining an affirmative, written stay order from the court, the central elements of the fraud matrix—including the February 2024 asset vesting markers and the agency's subsequent administrative spoliation—hardened into immutable facts.

82

The memorandum establishes that the state cannot satisfy the two-part test required to withdraw these admissions, as the merits are already conclusively determined by their own written non-retention logs, and any retroactive cure would severely prejudice Plaintiffs while directly rewarding the state's dilatory attrition model.

iii. The Case Chronology Appendix and Core Evidentiary Architecture: To map the full architecture of the conspiracy, Plaintiffs attached an exhaustive Case Chronology Appendix detailing every material transaction spanning from the Relator's initial separation from state service on December 29, 2023, through the multi-front litigation lifecycle ending on March 26, 2026. This comprehensive ledger links the "Shadow Period" of unauthorized capital detention to the subsequent "Executive Blackout" and database erasures occurring across the state's oversight bureaus. By embedding this uncontradicted matrix into the trial record, Plaintiffs demonstrate that the state is entirely powerless to retroactively sanitize its behavior, requiring the court to strike the state's impertinent responsive pleadings and enforce the self-executing admissions as the final judicial truth.

kkk. March 27, 2026: Plaintiffs received a formal operational response from the Ohio Department of Administrative Services (DAS) regarding outstanding requests for the statutory bonding and fidelity insurance records of individual corporate officers affiliated with OPERS and the Ohio Public Employees Deferred Compensation Program (**Fed. Exh. 50**). In its transmittal, DAS certified that it does not maintain custody or control over the operational registries or bonding instruments for personnel affiliated with these systems, directing that all such forensic requests be submitted

83

directly to the target agencies themselves. This administrative redirection provides further evidence of the closed-loop, unaccountable routing model employed across the state's executive infrastructure: the central oversight department disclaims structural custody of required public official bonds, while the underlying fiduciary networks concurrently withhold those same instruments in discovery to systematically shield their leadership from direct liability.

lll. April 10, 2026 (Plaintiffs' Reply in Support of Motion to Strike and Lodging of the 20 Admitted Facts Matrix): Plaintiffs filed a formal Reply in Support of their Motion to Strike Defendant's Memorandum Contra (**Fed. Exh. 51;** State Court Record Case No. 26CV000311), permanently locking a matrix of 20 Deemed Admitted Fact**s** into the record due to ODC's complete discovery default under Civ.R. 36. Because the agency failed to timely answer or secure a protective order, the filing establishes the following components as conclusive matters of law:

   i.   The Certified Core Admissions: The record now stands as an uncontested truth that ODC received a valid, "fully completed" transfer application on February 28, 2024 (Admissions 1, 13, 14); failed to issue any "bad order" notice within 30 days (Admission 2); sat on the vested assets for a 130-day "Shadow Period" before transmitting them to OPERS (Admission 3, 11); and its counsel formally certified that the agency "did not retain a copy" of the critical July 10, 2024 transmission log, leaving it with zero physical or digital evidence of the transaction in its permanent systems (Admissions 6, 7, 8, 12).

   ii.   The Conclusive Impact of ODC's Silence: Citing *State ex rel. Worcester v. Donnellon* and the newly issued *State ex rel. Harris v. Starcher*

84

(2026-Ohio-1089), the memorandum demonstrates that a state agency speaks exclusively through its contemporaneous record. ODC's explicit admission of record non-retention triggers a mandatory presumption of administrative spoliation and bad faith. By failing to assert any timely defenses, under *State ex rel. Kent Elastomer Products, Inc. v. McCloud* (2026-Ohio-1105), the state network has irrevocably waived all affirmative defenses, transforming its pending Motion to Dismiss into a procedural ghost unable to override its established admissions of Conversion and Constructive Fraud.

iii. Ministerial Duty vs. Arbitrary Power and the Four-Phase Fraud Anatomy: The filing outlines the complete anatomy of state-sponsored fraud across four distinct operational phases: Phase 1 (Lulling) through unconstitutional processing delays; Phase 2 (Invention) via post-vesting "shadow requirements" like the unauthorized notary hurdle; Phase 3 (Denial) by floating an "incomplete application" narrative to the court; and Phase 4 (Spoliation) through the systematic scrubbing of data logs. Plaintiffs codify that as a Trustee under R.C. 148.04, ODC holds zero discretionary or policy-making authority to hold capital hostage or alter vesting metrics to capture a commercial float pool at the expense of its beneficiaries.

iv. Attritional Tactics Mandating Fee-Shifting: Finally, the submission invokes *Sorin v. Bd. of Edn.* to demand full fee-shifting and punitive components. Plaintiffs establish that when a sovereign entity engages in wanton, oppressive, and dilatory litigation to force a solo practitioner into an expensive forensic reconstruction of a purged record, the "amount in controversy" serves as an equitable floor rather than a ceiling. Plaintiffs assert that capping fees would grant state actors a *de facto*

85

license to obstruct, concluding that because ODC has textually admitted to unauthorized dominion and intentional record destruction, it has stripped itself of statutory immunity under R.C. 2744.03(A)(6), leaving the trial court with the sole remaining task of liquidating the precise financial price of the state's bad faith.

mmm. May 20, 2026 (Plaintiffs' Omnibus Notice of Waiver, Notice of Uncontested Record, Reply in Support, and Motion for In-Camera Inspection): Plaintiffs filed an Omnibus Motion and proposed entry under Civ.R. 53 (**Fed. Exh. 52;** State Court Record Case No. 26CV000311), locking the evidentiary record and establishing a total procedural default by Defendant ODC. The filing memorializes the May 4, 2026 Pre-Trial Hearing Conference conducted before Staff Attorney Shafer (**Fed. Exh. 52**; **State Exh. K-1.1**), where the defense sat in documented silence when confronted with a detailed "Criminal Inventory." Because ODC failed to oppose Plaintiffs' Civ.R. 53 Motion within the statutory window following its May 5, 2026 service, the request for a Court-Appointed Special Master stands as an uncontradicted structural default. Under Civ.R. 36 and settled waiver doctrines, this non-response operates as a dispositive concession, permanently establishing the following parameters within the record:

   i.    Admissions by Silence and Instrumental Estoppel: The state network irrevocably conceded its systematic administrative spoliation, an unconstitutional 800-day sequestration of vested private property, and the intentional omission of the January 16, 2025 "Lulling Letter" from the appellate transmission. Crucially, the record previously establishes that ODC successfully executed a separate 2025 conveyance of $50,000 for Plaintiffs *without* requiring a notary, judicially

86

estopping the state from claiming the uncodified "Notary Protocol" is a mandatory security requirement rather than an arbitrary asset-containment barrier.

ii. The Fiduciary Paradox and Leadership Vacuum: The memorandum exposes a profound ethical crisis in the state's legal representation, charging the Ohio Attorney General's office with abandoning its statutory mandate to act as a defensive shield for administrative spoliators. The filing logs that this institutional collapse was punctuated by the Attorney General's sudden, mid-term resignation effective June 7, 2026—announced shortly after the transmission of Plaintiffs' May 5, 2026 special master demand—triggering an adverse inference that leadership fled to evade federal judicial oversight. Plaintiffs reinforced this structural breakdown by introducing an official public rebuke from the Ohio Speaker of the House, which codified the executive branch's administration of public initiatives as "patently negligent," neutralizing any remaining presumption of regularity.

iii. Clerk Placement on Actual Notice: The motion records that on May 18, 2026, Plaintiffs placed the Franklin County Clerk of Courts administration on formal, written Actual Notice of record tampering and fraud (**State Exh. K-2.1-4**). Despite receiving precise forensic parameters of the appellate record sanitization, the Clerk's Compliance Division deployed a bureaucratic "stall protocol" rather than executing its mandatory duties. Because the remediation window expired on May 19, 2026, in absolute non-compliance, the Clerk's infrastructure finalized its total inclusion within the scope of upcoming court-monitored forensic oversight.

87

iv.  The Crime-Fraud Exception and Evidentiary Preclusions: Plaintiffs moved for an immediate In-Camera Inspection of communications between ODC and its counsel regarding the intentional scrubbing of the record. The filing demonstrates that a prima facie showing of willful spoliation strips away the attorney-client privilege under the Crime-Fraud Exception, requiring judicial review to identify individual agents subject to personal liability under R.C. 9.86. Concurrently, Plaintiffs moved to preclude the defense from introducing post-facto expert appraisal reports, arguing that because ODC executed its asset denial without expert advice at the time of the breach, it cannot later purchase a retroactive defense to erase years of accrued statutory damages.

v.  Plenary Mandates of the Proposed Special Master Order: Driven by the total failure of state remedies, the proposed entry strips the bureaucracy of its administrative leverage, transferring operational control to a Court-Appointed Special Master vested with five self-executing mandates: (1) immediate operational escrow and asset seizure of the ODC balances; (2) root-level systems access to freeze metadata and reconstruct spoliated transaction logs; (3) unilateral power to bypass the non-compliant infrastructure and directly execute all mandatory fund transfers; (4) compulsory subpoena and deposition power to examine implicated personnel under oath—including Clerk Supervisor Wilson, Chairman Mabe, Executive Director Gresh, and Legal Compliance Director Chance; and (5) the immediate delivery of a mandatory Report of Accountability by the Clerk's Compliance Division. Plaintiffs conclude that because the defense has systematically defaulted on every legal threshold, the trial court's sole

remaining function is the entry of final judgment and the liquidation of the precise price of the state's bad faith.

nnn. May 28, 2026 (The Supreme Court of Ohio Slip Opinion and Terminal Collapse of State Remedies): The Supreme Court of Ohio issued a unanimous, 7-0 *per curiam* slip opinion in *State ex rel. Haydocy v. Ohio Pub. Emps. Retirement Sys.*, Slip Opinion No. 2026-Ohio-1928 (**Fed. Exh. 53**), affirming the Tenth District's dismissal of the underlying mandamus action. This outcome-determinative ruling finalized the exhaustion and terminal collapse of state-level remedies by establishing a sweeping regulatory shield for administrative non-compliance. In an extraordinary holding under Paragraph 33, the Court ruled that an administrative agency's "nefarious intent," bad faith, or systemic data sanitization are completely "irrelevant" to a state constitutional property inquiry, provided the agency operates under a broad, self-prescribed administrative mandate. By expanding administrative immunity to insulate intentional record spoliation from judicial review, the decision fundamentally dissolved the operative constitutional compact, rendering the state judiciary structurally incapable of correcting systemic fiduciary breaches.

   i. In an acute logical contradiction, the Court asserted that while Plaintiff is entitled to the benefit of "reasonable inferences," the uncontradicted facts detailing the enterprise's fraud were merely "speculative." The majority completely disregarded the fact that the ODC/OPERS compliance network entered written, signed admissions acknowledging they failed to retain the primary, fully completed February 2024 fund-transfer application after transmitting it to OPERS. While the defense network has previously stipulated to this workflow, and adjacent tribunals

89

have historically recognized the transaction's mechanical legality, the Court's analysis completely reverses the burden of proof. Under settled Ohio law, a fiduciary's admitted non-retention of its own core compliance records constitutes a prima facie showing of bad faith by operation of law. Ultimately, the opinion bypassed the supreme constitutional baseline: public retirement boards entirely lack the statutory or discretionary authority to invent un-promulgated internal protocols to gatekeep, convert, or defer the migration of vested private capital.

ii.     Furthermore, the Court's specific procedural assertion that Plaintiff failed to properly raise the constitutional question in the lower proceedings is both factually incorrect and legally specious. The Constitution is not an isolated pleading requirement that must be explicitly conjured by magic words; it is the absolute, self-executing baseline that governs every interaction between state fiduciaries and private citizens. Even if the Court's hyper-technical pleading standard were correct, the record confirms that Plaintiff met that threshold twice over. The majority's refusal to engage with the constitutional claim is an outcome-determinative maneuver designed to insulate the state network from judicial accountability once its administrative defaults and record-purging were fully exposed.

iii.    The Fatal Factual Omissions and Revision of Litigation History: To engineer its structural holding, the *per curiam* opinion relies upon an artificial timeline that misconstrues the transactional record. The Court completely blinded its review to the spoliated database logs, systematically ignoring the primary, uncontradicted February 28, 2024 fund-transfer contract application date stamped on February

90

28, 2204 by ODC and forwarded to OPERS after a ~four month delay. Instead, the Court adopted the state's manufactured narrative, anchoring its entire legal analysis upon the secondary May 28, 2024 timestamp. This revisionist history successfully obscured a 130-day "Shadow Period" of unauthorized asset detention, treating the primary completed submission as a nullity and permitting administrative spoliators to retroactively manipulate the vesting metrics of the estate to evade conversion liabilities.

iv. The Structural Misapplication of Precedent and Statutory Law: The High Court's legal framework fundamentally misapplied Ohio Adm.Code 145-2-67(A). The majority interpreted the board's power to prescribe the "time and manner" of rollover distributions as an unbridled, discretionary license to enforce retroactive, un-promulgated barriers—such as the "Notary Protocol"—after an application is already fully completed and vested. In doing so, the Court attempted to distinguish the controlling precedent of *State ex rel. Davis v. Public Employees Retirement Board* by asserting that because the term "application" is not explicitly defined by statute, the agency possesses unfettered discretion to alter compliance rules mid-stream. This reasoning upends standard trust law, transforming a mechanical, non-discretionary ministerial duty into an open-ended asset-retention barrier designed to protect institutional cash flows at the direct expense of account beneficiaries.

v. The Denial of Record Restoration Under S.Ct.Prac.R. 15.08: Finally, the Supreme Court denied Relator's emergency Motion to Supplement the Record under S.Ct.Prac.R. 15.08, utilizing a hyper-technical, circular justification. The Court

91

ruled that because the Tenth District Clerk completely omitted the fraudulent January 16, 2025 "Lulling Letters" from the certified index, the documents technically "failed to appear on the lower docket" and could not be reviewed on appeal. By holding that the lower court's proactive removal of evidence effectively insulates that same tampering from appellate review, the High Court certified the absolute closed-loop nature of Ohio's administrative tracking registries. This final denial confirmed the total futility of seeking an honest accounting within the state infrastructure, completing the prerequisite path for immediate, primary federal court intervention.

ooo. May 28, 2026 (PM) (The State's Notice of Supplemental Authority and Structural Evasion): Hours after the release of the slip opinion, Defendant ODC filed a Notice of Supplemental Authority in Support of its Motion to Dismiss (**Fed. Exh. 54;** State Court Record Case No. 26CV000311). In this submission, the Ohio Attorney General introduces the newly minted *per curiam* opinion as Exhibit A—marking the state compliance network's very first evidentiary exhibit introduced on the record in this litigation. Characterizing Plaintiffs' common-law action as a "duplicative" and "cunning" effort to bypass the uncodified notarization hurdle, ODC attempts to use the high court's deeply flawed pension-mandate ruling as a blanket jurisdictional shield to dismiss the case.

   i. This notice strategically attempts to decouple ODC from its own deep exposure, completely ignoring the fact that ODC has already legally committed itself to 20 self-executing Civ.R. 36 admissions confirming intentional spoliation, unauthorized dominion, and contract destruction.

92

ii. The Concurrent Clerk Default: Simultaneously, the Franklin County Clerk's office issued its official administrative response, explicitly refusing Plaintiffs' formal demand to un-sanitize and transmit the complete public record to the Supreme Court (**Fed. Exh. 54A;** State Court Record Case No. 26CV000311). In an extraordinary display of contumacious arrogance and structural fraud, the Clerk's Compliance Division asserts that its office was entirely absolved of its non-discretionary ministerial duties based upon the core findings of the high court's *per curiam* decision. This administrative rationale is a legal impossibility: the Clerk attempts to retroactively validate a historical record-tampering default by relying on an appellate ruling that was under active challenge via Plaintiffs' pending, uncontradicted Motion for Reconsideration. By locking this defense into the lower record, the state's administrative and clerical networks finalized their joint exposure, establishing the definitive, closed-loop capture of state-level remedies necessary to anchor immediate federal jurisdiction.

ppp. June 3, 2026 (The Unrebutted Motion for Reconsideration and Structural Timeline Manipulation): Plaintiffs filed a formal Motion for Reconsideration with the Supreme Court of Ohio, exposing the fundamental structural errors and factual omissions embedded within the May 28, 2026 *per curiam* opinion (**Fed. Exh. 55;** State Court Record Case No. 2025-0850]. Under the court's strict procedural rules, the state network was provided a clear, non-negotiable deadline of June 24, 2026, to submit an opposition or clinical rebuttal to the structural fraud exposed in the motion. That mandatory window expired in absolute silence. Rather than defending the integrity of its record or offering a merits-based justification for its asset-containment protocols, the defense

elected to let the clock lapse without a response. This strategic silence and operational paralysis under a date-certain deadline permanently locks the record, triggering an adverse inference that the enterprise is entirely without power to rebut the underlying claims.

i. The Anatomy of the Anticipated Defense and Corporate Enterprise Motive: The unrebutted motion systematically maps out the anatomy of the defense network's asset-retention scheme, transforming their own moving papers into a confession of a systematic enterprise motive. In adjacent filings, the ODC/OPERS apparatus openly conceded that it forces "tens of thousands of other former public employees" to submit to its un-promulgated, extra-legal "Notary Protocol" to access their vested capital. This admission confirms that the protocol is not an isolated security measure, but a highly coordinated system designed to halt massive capital migrations and maximize an unauthorized, multi-million-dollar administrative cash float pool at the direct expense of its beneficiaries.

ii. Technical Illusions and the Falsification of the Administrative Record: The motion details how the state network relies entirely upon technical illusions to mask its conversion of private funds. Plaintiffs introduce newly uncovered evidence demonstrating that the data streams and transmission logs provided to the trial court were actively curated and manipulated. By engineering a false, post-facto chronological timeline that deletes the primary February 28, 2024 completed application and highlights only the secondary May 28, 2024 marker, the defense attempted to manufacture a "presumption of regularity" that contradicts the true physical record. This deliberate sanitization of data registries

94

constitutes an ongoing fraud upon the court, stripping the bureaucracy of any entitlement to judicial deference.

iii. The Structural Flight From Accountability: The acute awareness of impending exposure under federal Civil RICO and the imminent delivery of these public record confessions to a federal index caused a total structural fracture within the state's executive legal leadership. Upon actual notice that these signed written admissions of spoliation were entering an unscrubbed docket, Ohio Attorney General David Yost executed an abrupt, early resignation effective June 7, 2026—fleeing to a private entity a full seven months before the expiration of his term. The adverse inference requires a finding that this mid-term desertion was engineered to evade federal judicial oversight, creating a profound leadership vacuum that highlights the enterprise's consciousness of guilt and completes the total collapse of institutional accountability within the state's executive branch.

iv. The Extensive and Inflexible Grounds for Mandamus and Common-Law Tort Relief: The structural default finalized on June 24, 2026, cements the extensive, inflexible contractual, statutory, trust, and constitutional grounds supporting immediate judicial relief. Because a public fiduciary operates under a strict, non-discretionary ministerial mandate under R.C. 148.04, the defense lacks the legal authority to object to a completed asset migration or invent ad-hoc procedural hurdles. While the state network attempts to treat the high court's *per curiam* opinion as a total coup to eliminate judicial review over spoliation and fraud, that opinion is a legal nullity. The supreme constitutional order is self-executing, and an administrative agency's assertion that the Constitution is a

95

localized pleading requirement represents a profound abdication of its public trust.

v. The Jurisdictional Trigger for Immediate Federal Intervention: Attached directly to the lower court index as State Exhibit K-1 is the Franklin County Clerk's absurd, post-facto rationalization for its record-tampering default, where it attempted to use a future appellate slip opinion to validate a past, historical exclusion of evidence. This preposterous rationale confirms that the Clerk's office and the ODC compliance network are acting as unified litigation partners to sequester private property behind a closed-loop digital wall. Because the state's highest tribunal has signaled its total complicity by sitting in absolute operational silence on the pending Motion for Reconsideration, the state infrastructure has certified its complete unfitness for office. The expiration of the June 24, 2026 deadline marks the final, absolute exhaustion of state-level remedies, pulling the terminal jurisdictional trigger for immediate, primary federal court intervention under the Crime-Fraud exception. Because Plaintiffs' claims seek immediate injunctive relief against a continuous, unconstitutional sequestration of private property without due process, they cannot be restricted as a standard state-governed tort. Furthermore, because ODC shamelessly utilized an unapproved discovery stay as an informational blockade to actively purge database registries, the court's jurisdiction to halt this clinical spoliation remains immediate and absolute.

qqq. June 4, 2026 (Plaintiffs' Response to ODC's Second Motion to Dismiss and Reply Supporting In-Camera Inspection): Plaintiffs filed a combined Response in

96

Opposition to Defendant's Second Motion to Dismiss and a Reply in Support of their Motion for an In-Camera Inspection (**Fed. Exh. 56;** State Court Record Case No. 26CV000311).

i. This filing introduces a definitive, certified chronological matrix of administrative fraud and record spoliation. Grounded in the absolute evidentiary doctrine of *omnia praesumuntur contra spoliatorem*, the response demonstrates that because the defense network executed its policy-based denial using a deliberately sanitized record, its subsequent moving papers rely on structural falsehoods.

ii. The submission isolates the core legal reality: the contradiction between ODC's written discovery admissions and its pleading narratives proves a consciousness of guilt that cannot be mediated through further briefing. Plaintiffs argue that the fundamental cardinal virtues of administrative equity—temperance, wisdom, justice, and courage—require the trial court to look behind the manufactured corporate veil, deny the motion to dismiss, and immediately grant the applications for an in-camera inspection and the appointment of a Special Master to stabilize the contested res.

rrr. July 1, 2026: A profound chronological conflict exposed a shameless, engineered effort by a cornered administrative apparatus to evade judicial review and violate its oath of office. The electronic execution of the enterprise's defensive concealment shifted from deliberate latency to active, sloppy panic on July 1, 2026. The state tribunal's reliance on R.C. 2743.03 to mandate exhaustion in the Court of Claims is a calculated jurisdictional misdirection. It is a fundamental,

black-letter principle that the Constitution is the supreme law of the land, and no statutory shell possesses the authority to override, defer, or suspend self-executing constitutional mandates. Demanding administrative exhaustion within this broken framework is a bad-faith legal fiction; there is zero professional or legal proof that the Court of Claims offers an independent forum rather than more of the same institutional protection across a multi-tiered, politically insulated apparatus winding through the Common Pleas, Appellate, and Supreme Court levels. The chronological data markers left upon the state trial court docket (Case No. 26CV000311) establish a coordinated, *sua sponte* effort to sanitize the record and insulate Defendant ODC from a terminal discovery crisis:

i. 9:14 AM: Plaintiffs filed their formal Notice of Pre-Hearing Client Statement, forcing an unscrubbed criminal inventory and immutable Civil Rule 36 admissions directly onto the record (**Fed. Exh. 57A**).

ii. 9:17 AM (The Electronic Trigger): Exactly three minutes later, the court's automated server deployed an email burst notifying the parties of a signed dismissal entry (**Fed. Exh. 57C**). The metadata of that automated notification claimed that Staff Attorney Darcy Shafer had submitted the decision on the prior afternoon, June 30, 2026, at approximately 1:52 PM. (**Fed Exb. 57B**).

iii. This retroactive narrative flatly contradicts the physical reality of the court's own administrative data stream. The Clerk's official, physical timestamp records that the dismissal document did not exist and was not filed until July 1, 2026, at 9:10 AM.

iv. The operational mechanics of this three-minute window expose a definitive fraud marker. The filing of Plaintiffs' 9:14 AM forensic payload triggered a severe administrative panic within the staff attorney's office. To intercept and neutralize the client statement before it could be formalized at the upcoming 10:00 AM conference, Staff Attorney Darcy Shafer rushed the issuance of a pre-calculated dismissal entry.

v. 9:37 AM (The Final Operational Demand): Plaintiff transmitted a formal electronic communication to Staff Attorney Shafer and defense counsel, demanding definitive written confirmation by 9:50 AM regarding the status of the scheduled hearing (**Fed. Exb. 57D**). Plaintiff explicitly recorded that any further administrative silence would be interpreted as a terminal cancellation of the assembly. This strategic avoidance of the Rule 16 conference represents a calculated effort by the state actors to bypass a critical procedural threshold and insulate the enterprise from responding to the immutable Civ.R. 36 admissions and verified spoliation claims currently mature upon the record.

vi. 9:49 AM: Darcy Shafer transmitted an operational response formally asserting that the Rule 16 assembly remained scheduled to initialize at 10:00 AM—a clinical confirmation of ongoing procedural regularity issued mere minutes before the enterprise executed its administrative flight.

vii. Operating with extreme haste, the technical compliance unit back-dated and manipulated the electronic portal entries to construct a false chronological sequence showing the decision was finalized *prior* to the 9:14 AM filing

(**Fed. Exh. 57B**). This fraudulent timeline collapsed completely at 10:00 AM during the live status conference, when Ms. Shafer admitted on the record that she was entirely unaware the case had been dismissed, before choosing administrative flight and abruptly severing the communication line to silence the unfolding evidentiary exposure without consent of plaintiffs.. (**Fed. Exh. 57D**)

viii. 10:14 AM (The Primary Notice of Un-Sanitized Facts): The uncontradicted operational record confirms that the individual defendants and the trial court's staff infrastructure engaged in an explicit, panicky falsification of the electronic docket to escape an impending procedural crisis. Plaintiffs have formalized this structural breakdown by transmitting the definitive forensic notes of the July 1, 2026 hearing (**Fed. Exh. 57E**) to Staff Attorney Darcy Shafer and defense counsel, permanently locking the following fatal entries into the record:

1. The Factual Timing Collusion: The electronic metadata in Federal Exhibit 57B claims that Staff Attorney Shafer finalized and submitted the dismissal decision on June 30, 2026. This timeline is exposed as a complete administrative fabrication by Shafer's own recorded admission during the 10:00 AM conference that she was entirely unaware the case had been dismissed.

2. The Forced Docket Manipulation: The enterprise's original, bad-faith intent was to conduct a sham status conference before quietly docketing a pre-calculated dismissal entry. However,

100

Plaintiffs' rapid-fire service of the forensic criminal inventory and immutable Civil Rule 36 admissions at 9:14 AM (**Fed. Exh. 57A**) forced their hand, triggering an internal panic that caused the technical compliance unit to sloppily back-date the entry to create the illusion of a pre-existing order.

3. The Administrative Flight and Suppression: Caught in an irreconcilable chronological paradox on a recorded line, the court's representative chose administrative flight over constitutional fidelity. By abruptly severing the communication line without consent to suppress the discussion of ODC's admitted contract shredding and fiduciary breaches, the state compliance network provided undeniable forensic proof of a terminal collapse of due process, executed solely to insulate a private-market investment enterprise from civil discovery and personal liability.

2. This systemic manipulation of the trial court dockets occurred under the watch of an altered executive legal command structure. Following the mid-litigation resignation of David Yost effective June 7, 2026—an extraordinary executive flight executed precisely as signed confessions of record spoliation entered the federal index—interim Ohio Attorney General Andy Wilson was sworn into office on June 8, 2026, to serve out the unexpired term

a. The transition of leadership within the state's chief law enforcement office resulted in zero course correction or objective regulatory review. Instead, the incoming Wilson administration immediately adopted, ratified, and advanced the corrupt defensive posture engineered by its predecessor.

101

b.  By continuing to deploy the same outsourced legal compliance networks, boilerplate discovery blockades, and fraudulent preclusion narratives, the new Attorney General has formalized the institutional continuity of the enterprise. The state's executive legal apparatus operates as a continuous, unified litigation shield, weaponizing panicked *sua sponte* dismissals and manipulated electronic registries to systematically strip public beneficiaries of their vested capital trails.

## V. ALLEGATIONS OF STRUCTURAL CORRUPTION & THE CONCEALMENT ARCHITECTURE

1.  Institutional Attrition and Data Spoliation Framework: The enterprise employs a dual-layered strategy designed to evade adjudication on the merits. When confronted with indisputable, compliant expert evidence, institutional actors execute intentional defaults on substantive merits and mandatory deadlines. They systematically pivot to manufacturing hyper-technical, non-substantive disputes to stall proceedings.

2. Forensic Record Spoliation: To conceal administrative misconduct, executive actors utilize informational asymmetry to manipulate official relational databases. This is documented by a six-week data blackout covering critical complaint windows. When forced to produce records post-default, the enterprise retroactively injected or selectively unscrubbed missing entries (e.g., the December 16, 2025 complaint), establishing a digitally provable pattern of back-dating and structural fraud on the tribunal.

a.  The Goal: Insulation from Liability and Asset Sequestration. The immediate objective is to block the recovery of consumer capital and protect individual state and corporate actors from personal liability under 42 U.S.C. § 1983. By retroactively manufacturing a false facade of administrative compliance and exhausting litigants through calculated

102

delays, the enterprise seeks to force judicial rubber-stamps of administrative defaults, thereby permanently insulating interlocking systems of state-level capture and corporate predation from meaningful review.

b. The Victims: Defenseless Public Beneficiaries and Consumers. These parties constitute the common citizens and private consumers left clinically exposed within a captured state legal framework. As regulatory gatekeepers—including the Ohio Inspector General and the Auditor of State—have fundamentally abdicated their mandatory oversight duties, plenary federal civil RICO intervention and the immediate deployment of a Rule 53 Special Master remain the solitary mechanisms for substantive legal redress. The enterprise deliberately preys upon good-natured Ohioans who seek only the restoration of their vested assets and lack the capital reserves to engage in multi-year litigation. Predators like OPERS and their confederates weaponize this inherent reasonableness and the profound asymmetry of power to execute an asset-retention scheme that stands as the exact operational opposite of a fiduciary's sworn duty.

3. The Unconstitutional "Notary Protocol" Pretext: Under Ohio Revised Code § 145.40, the text commands that upon beneficiary instruction, the retirement system shall pay a departed member their accumulated contributions. This statutory command is absolute, non-discretionary, and ministerial.

a. To circumvent this statutory restriction, Defendants invented a post-facto, unpublished, extra-statutory "Notary Protocol"—a non-statutory hurdle requiring a redundant third-party identity verification before executing simple, digital fund transfers.

103

b. Pursuant to the mandatory provisions of the Ohio Revised Code, OPERS is permitted a finite sixty-day window of administrative float, after which the legal title to those sequestered assets vests irrevocably in the Plaintiff by operation of law.

c. To demonstrate the purely arbitrary and punitive nature of this protocol, when Plaintiff was forced to liquidate a portion of his assets to fund critical childcare, Defendants successfully processed a $50,000.00 conveyance without demanding a notary, judicially estopping themselves from claiming the protocol is a mandatory security measure. The protocol is applied selectively as an administrative weapon to exhaust claimants through artificial friction.

4. Executive Whistleblower Suppression and Total Administrative Abdication: In late 2025, Plaintiff discovered the systemic failure of records integrity within the state agencies and filed a formal, verified whistleblower complaint with the Auditor of State, Keith Faber, detailing the unconstitutional sequestration of capital.  Abdicating its mandatory oversight role, the Auditor's department "scrubbed" the evidentiary record, engineering a clinical six-week administrative vacuum to suppress the disclosure and insulate the executive management of OPERS and ODC from legal liability (**State Exh. J-1**).

a. Despite being formally apprised of these structural defaults, the Franklin County Prosecutor's Office summarily disclaimed any duty to investigate systemic administrative crime; concurrently, Plaintiff's efforts to engage the Ohio Inspector General were met with a functional communications blackout, as his formal referrals were completely rejected by a non-operational intake line. This complete institutional failure creates a total vacuum of administrative oversight, rendering all internal state administrative remedies completely unavailable and futile.

104

5. Documented Public Record Spoliation & Fraud on the Tribunal: In parallel state litigation forced by this attrition (Case No. 26CV000311), Plaintiffs served clear discovery demands targeting the electronic communication trails of this protocol. In formal responses under Ohio Civil Rule 36, Defendants explicitly admitted that they "did not retain" critical, dispositive electronic financial transaction logs despite being under a strict, continuous statutory preservation obligation (**State Exh. A.4-11**).

    a. Furthermore, the defense apparatus actively executed a clinical data-sanitization of the record transmitted to the Supreme Court of Ohio in Case No. 2025-0850, deliberately omitting a critical January 16, 2025 "Lulling Letter" to deceive the high court and engineer a procedural default against Plaintiff.

    b. The Supreme Court of Ohio's assertion that the "nefarious intent" of OPERS is irrelevant to the constitutional inquiry is a legal absurdity, as the invocation of an adverse inference against spoliators necessitates a clinical judicial evaluation of the bad faith and suppressed evidence driving the administrative concealment.

6. Immediate Collateral Exploitation of the High Court's Faulty Opinion: Rather than seeking to remedy their documented, black-letter defaults, Defendant ODC has movingly positioned its entire state-court defensive strategy upon the immediate exploitation of the Supreme Court of Ohio's flawed *per curiam* slip opinion in *State ex rel. Haydocy v. OPERS*, Slip Opinion No. 2026-Ohio-1928.

    a. In adjacent state enforcement litigation (*Amy N. Haydocy, et al. v. Ohio Public Employees Deferred Compensation Program, et al.*, Case No. 26CV000311, Franklin County Court of Common Pleas), Defendant ODC moved to dismiss the claims against it by arguing that the high court's May 28, 2026 decision operates

105

as a complete structural bar to further inquiry into its electronic record management.

b. However, the operational integrity of that proceeding collapsed on July 1, 2026, through an irreconcilable chronological paradox that unmasked an engineered effort to insulate ODC from fiduciary liability. At 9:14 AM, Plaintiffs filed a Notice of Pre-Hearing Client Statement detailing systematic spoliation and Civil Rule 36 admissions. Exactly three minutes later, at 9:17 AM, the court issued an automated email burst notifying parties of a dismissal entry, which claimed Staff Attorney Darcy Shafer submitted the decision on June 30th at approximately 1:30 PM. This narrative flatly contradicts the clerk's official July 1, 9:10 AM physical timestamp, triggering a mandatory adverse inference of deliberate fraud and record sanitization as a matter of law.

c. The fraudulent timeline fractured entirely during the live 10:00 AM status conference when Shafer admitted on the record that she was unaware the case had been dismissed. When Plaintiffs read ODC's fiduciary breaches into the record, the court's representative chose administrative flight over constitutional fidelity, abruptly severing the communication line without consent to silence the evidentiary crisis.

d. The state tribunal's reliance on R.C. 2743.03 to compel exhaustion within the Court of Claims is a calculated jurisdictional misdirection. It is a foundational, black-letter principle that the Constitution is the supreme law of the land, and no statutory shell possesses the authority to override, defer, or suspend self-executing constitutional mandates. Demanding administrative exhaustion within this broken

106

framework is a bad-faith legal fiction designed to force Plaintiffs into a restrictive administrative gauntlet across a multi-tiered, politically insulated apparatus winding through the Common Pleas, Appellate, and Supreme Court levels. Because Plaintiffs' claims seek immediate injunctive relief against a continuous, unconstitutional sequestration of private property without due process, they cannot be restricted as a standard state-governed tort. Furthermore, because ODC shamelessly utilized an unapproved discovery stay as an informational blockade to actively purge database registries, the court's jurisdiction to halt this clinical spoliation remains immediate, absolute, and entirely independent of statutory Court of Claims boundaries.

e. This maneuver constitutes an active, bad-faith effort to utilize an appellate decision secured through material record-sanitization to retroactively validate separate, distinct acts of spoliation. Defendant ODC has already formally conceded on the trial court docket that it failed to retain mandatory electronic transaction logs. Despite this confession, ODC actively sought and secured dismissal from Judge Holbrook, arguing that because the Supreme Court of Ohio was successfully induced into declaring administrative "nefarious intent" irrelevant to a mandamus claim, ODC is entirely insulated from civil liability for the physical destruction of Plaintiff's contract files.

f. This persistent effort to weaponize a defective, un-vacated state precedent to secure summary dismissals across distinct trial court dockets establishes a continuous pattern and/or practice of capital conversion and administrative fraud. Spanning from the Tenth District on June 10, 2025, to the Supreme Court on May

107

28, 2026, and now extending into Franklin County, this sequence perfectly unmasks the bad-faith containment architecture leveraged by the state enterprise: one agency engineers a post-facto timeline to evade a mandamus inquiry, while an adjacent agency concurrently utilizes that un-reviewed slip opinion to systematically extinguish a live civil docket anchored to active admissions of public record destruction.

## VI. CLASS ACTION ALLEGATIONS

1. Plaintiff brings this action on behalf of the Amy and Cory Haydocy Marital Unit and, subject to the appointment of independent counsel as requested herein, as a class action pursuant to Federal Rules of Civil Procedure 23. The proposed Class consists of: *All persons who have held vested capital accounts with OPERS or ODC, and whose fund transfers were delayed, denied, or conditioned upon compliance with the extra-statutory "Notary Protocol.*

    a.  Notice of Inherent Conflict & Request for Counsel: Plaintiff recognizes that an individual litigant cannot adequately represent the interests of a class due to the inherent conflicts of interest between class counsel and a class representative. Because the systemic nature of the Defendants' conduct makes a class action evident and necessary to accord complete relief, Plaintiff respectfully requests the appearance and appointment of independent, third-party class counsel to protect the interests of the putative class.

    b.  In the alternative, should class certification be denied or should independent class counsel not be appointed, Plaintiff maintains this action on an individual track to pursue all applicable personal tort claims, statutory violations, and independent claims for spoliation of evidence stemming from the Defendants' conduct.

c. Numerosity: The Putative Class comprises a vast statewide matrix of tens of thousands of former public employees, rendering individual joinder clinically impracticable. Defendant OPERS formally codified this profound institutional reach. (**Fed. Exh. 9, pg. 11**) in written responses submitted to the Tenth District—the jurisdictional seat of *Davis*, which has functioned as the operative legal baseline within this judicial division since 1963.

d. Commonality: While the application of the extra-statutory "Notary Protocol" satisfies the commonality requirements of *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011), Plaintiff recognizes that as a *pro se* marital unit, they cannot satisfy the Rule 23(a)(4) adequacy requirement to represent absent class members alone. Accordingly, Plaintiff requests the court condition class certification upon the appointment of qualified, independent third-party class counsel.

e. Fulfillment of Rule 23 Adequacy Metrics and Retention of Specialized Class Counsel: Plaintiff Cory A. Haydocy, Esq., is an active member in good standing of the Ohio Bar, a former senior investigative public attorney with extensive regulatory and litigation experience, and a practitioner formally admitted to the Bar of this Federal District Court. His economic, procedural, and constitutional interests are directly and mathematically aligned with the Putative Class, as both he and his family have been personally targeted and financially harmed by the Defendants' extra-statutory fund-containment protocols. To ensure that the interests of the Class and the core rights of Plaintiff's family are fully protected and unassailably served, Plaintiff has proactively taken structural steps to insulate this action from the resource asymmetry and procedural traps inherent in fighting an outsourced state defense network.

f.  Recognizing the physical and operational limitations of a single-attorney office when confronting a systemic, multi-front state concealment apparatus, and acknowledging the strict fiduciary obligations imposed by the United States Supreme Court in *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 625-26 (1997), the Relator has actively initiated consultations with elite, highly capitalized federal litigation firms specializing in complex Rule 23 class operations. By design, the Relator seeks to bifurcate the litigation tracks: remaining intimately involved as a deeply knowledgeable, sophisticated named Class Representative to drive the evidentiary inventory, while preparing to hand primary Rule 23 operational, administrative, and briefing obligations to an independent, contingency-backed class action firm.

g.  This structural alignment completely neutralizes any potential intra-class conflicts or dual-capacity challenges under Rule 23(a)(4). It ensures that the absent class members are backed by a heavily capitalized, independent institutional defense perimeter, while concurrently allowing Plaintiff to vigorously protect his family's distinct property entitlements without compromising his fiduciary obligations to the broader collective unit. The pairing of the Relator's insider investigative inventory with specialized class counsel provides the exact operational framework necessary to survive a motion to dismiss and safely weaponize the self-authenticating spoliation admissions anchored to this record (*Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 625-26 (1997)).

## VII. ALTERNATIVE EXHAUSTION, INADEQUACY OF STATE REMEDIES, AND SYSTEMIC FUTILITY

1. The Controlling Federal Framework for Exhaustion Exceptions: Under settled federal jurisprudence, a plaintiff is completely exempt from exhausting state administrative or legislative

110

remedies when the domestic corrective apparatus is unavailable, structurally biased, or calculationally futile. Plaintiffs have satisfied this threshold by demonstrating an unassailable evidentiary record under two primary United States Supreme Court doctrines:

   a. The Unavailability Standard: An administrative process is legally unavailable when it operates as a dead end, when its rules are completely obscured by shifting post-hoc protocols, or when administrative actors utilize procedural machinations, misrepresentations, and asymmetrical informational control to thwart a challenger's compliance. See *Ross v. Blake*, 578 U.S. 632, 643-44 (2016).

   b. The Structural Futility Standard: Administrative exhaustion is entirely excused when the underlying administrative framework is proven to be structurally incompetent, complicit in the underlying property deprivation, or incapable of providing an honest, merits-based review due to systemic institutional capture. See *Gibson v. Berryhill*, 411 U.S. 564, 575 (1973).

2. Chronological Specification of State Remedial Dissolution: The collapse of the Ohio constitutional compact and the systematic closure of all domestic remedial avenues track across an uncontradicted chronological timeline. If the Court grants the mandatory adverse inferences flowing from Defendants' admitted record-destruction, the evidence establishes a structural breakdown beyond a reasonable doubt:

   a. February 27, 2024: The statutory 60-day administrative window under R.C. 145.40 and 148.04 expires. Legal title to the private consumer capital vests irrevocably and uniquely in the Plaintiffs.

   b. February 28 – July 10, 2024 ("The Shadow Period"): Defendant ODC holds the fully completed rollover contract in a 130-day phase of unauthorized administrative float,

111

refusing to execute the transfer while systematically suppressing internal system transaction data logs.

c. June 26, 2024: Defendants retroactively inject and execute an un-promulgated, unpublished "Notary Protocol" to block asset migration, intentionally altering user interface accessibility to ensure the tracking trails remain obscured from the beneficiary.

d. June 10, 2025: The Tenth District Court of Appeals abdicates its judicial checking function by issuing a summary dismissal of Plaintiffs' mandamus action without conducting a single due process evidentiary assembly or permitting discovery, safely shielding the administrative enterprise from a merits-based review.

e. July 15, 2025: The lower clerk infrastructure certifying the record to the Supreme Court of Ohio systematically sanitizes the appellate index, intentionally omitting the dispositive January 16, 2025 "Lulling Letter" to engineer absolute judicial blindness at the high court level.

f. December 19, 2025: Defendant ODC successfully processes and clears an un-notarized direct capital conveyance of $50,000.00 for the identical Plaintiffs, forensically destroying their own security pretexts and locking in a binding individual collateral estoppel.

g. Late 2025 – Early 2026: Plaintiffs exhaust alternative oversight mechanisms. The Auditor of State deliberately scrubs its official statutory fraud log to erase Plaintiffs' compliance filings; the Inspector General's server is hard-coded to reject electronic service of criminal referrals; and the Franklin County Prosecutor's Economic Crimes Division disclaims any duty to investigate white-collar state corruption.

112

h. March 6, 2026: Defendant ODC blows past its mandatory discovery deadlines in parallel civil litigation, triggering a self-executing default under Ohio Civ.R. 36 and conclusively admitting to willful record destruction and unauthorized conversion.

i. May 28, 2026: The Supreme Court of Ohio rubber-stamps the administrative closed-loop in *State ex rel. Haydocy v. OPERS*, 2026-Ohio-1928, remarkably holding that a state agency's "nefarious intent" and intentional data sanitization are functionally "irrelevant" to a constitutional property inquiry.

j. June 7, 2026: Ohio Attorney General David Yost executes an abrupt, early resignation from his constitutional post seven months before his term's expiration, finalizing an executive flight synchronized precisely with the entering of signed confessions of record spoliation into the federal index.

k. July 1, 2026: The Franklin County Court of Common Pleas enters a *sua sponte* administrative dismissal at 9:17 AM—precisely three minutes after Plaintiffs filed a comprehensive forensic criminal inventory detailing the Defendants' immutable Civil Rule 36 admissions. During a live status conference at 10:00 AM, the staff attorney admits absolute ignorance of the dismissal entry before abruptly severing the communication line to silence the unfolding evidentiary crisis.

3. Legal Defeasance of the R.C. Chapter 2743 "Court of Claims" Evasion: The state tribunal's sudden, *sua sponte* reliance on R.C. 2743.02 and R.C. 2743.03 to mandate exhaustion within the Ohio Court of Claims is a calculated jurisdictional misdirection. This defensive artifice collapses under a cold functional and statutory analysis:

a. The Private-Market Operational Reality of ODC: Pursuant to Chapter 148 of the Ohio Revised Code, the Ohio Public Employees Deferred Compensation Program is a separate,

113

distinct, and autonomous statutory entity completely segregated from the state's corporate retirement architecture. Under R.C. 148.04, the Legislature explicitly stripped ODC of traditional sovereign administrative insulation, vesting it with independent, standalone authority to enter into private-market financial contracts and manage qualified investment accounts under Section 457 of the Internal Revenue Code. ODC is not the state. It is a private corporate citizen that can be sued.

b.  ODC maintains its own operational identity, utilizing captive beneficiary asset reserves that do not flow from the state's general revenue fund. Because the assets converted represent private, vested consumer capital held in trust, the injury constitutes a common-law conversion of an inviolate personal estate under Article I, Section 19 of the Ohio Constitution, placing the action squarely within the general original jurisdiction of the Court of Common Pleas.

c.  Defendants argue that the Court of Claims retains exclusive, original jurisdiction under R.C. 2743.02(F) to initially determine whether individual actors like Lauren Gresh, Karen Carraher, or Chris Mabe are entitled to personal immunity under R.C. 9.86. This position flatly misrepresents the plain text of the statute. R.C. 2743.02(A)(1) explicitly dictates: "To the extent that the state has previously consented to be sued, this chapter has no applicability."

d.  Through the passage of Chapters 145 and 148, the General Assembly established a distinct statutory trust framework, rendering these fiduciary networks directly answerable to their members. Furthermore, R.C. 2743.02(A)(1) mandates that any purported jurisdictional transfer to the Court of Claims is completely void if the officer or employee acted: "...with malicious purpose, in bad faith, or in a wanton or reckless manner."

114

e. Here, the individual defendants' bad faith and malicious purpose stand irretrievably locked into the record by their own signed admissions: they intentionally destroyed primary contract instruments, actively scrubbed database tracking registries to deceive reviewing courts, and selectively enforced a fraudulent "Notary Protocol" to capture an interest-free administrative float while concurrently waiving that exact requirement to disburse a $50,000 transaction for these precise Plaintiffs.

f. Because this conduct constitutes bad faith arbitrary governance, the individual defendants have stripped themselves of any statutory immunity veil. Forcing an injured consumer to abandon a mature common-law trial record to enter a highly restrictive state administrative gauntlet satisfies the absolute threshold for primary federal civil RICO and civil rights jurisdiction under *Monell v. Department of Social Services*, 436 U.S. 658, 690-91 (1978).

g. Preemption of Twombly/Iqbal Pleading Thresholds: The Structural Reality of Informational Asymmetry: Because Defendants have systematically violated their statutory record-preservation mandates, formally admitted under Ohio Civ.R. 36 that they "did not retain" critical electronic transaction logs, and continuously blocked all meaningful civil discovery via bad-faith motions to stays and motions to dismiss the identity of every specific administrative actor, third-party technology vendor, and compliance officer complicit in this data-manipulation is currently unknowable to Plaintiffs. Plaintiffs explicitly allege that this informational asymmetry is a deliberate, structural feature—not an incidental byproduct—of the racketeering enterprise.

h. Defendants cannot rely on the heightened pleading standards of *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) to secure a

115

dismissal by arguing that Plaintiffs have failed to name the exact individuals who executed the record purges, when the Defendants themselves have locked the doors to the database, suppressed whistleblower audits, and spoliated the tracking files that would reveal those identities.

i. Outlining the systemic, operational architecture of the fraud fully satisfies the pleading threshold at this stage of the litigation. Conversely, Plaintiffs remain resolutely prepared to collaborate with a Court-appointed Special Master to forensically identify the administrative confederates, ensuring full accountability through criminal referral and sworn testimony. It is a foundational tenet of federal jurisprudence that a plaintiff is not required to conclusively prove their case on the face of the initial complaint, particularly where the dispositive material recording the illicit conduct remains within the defendant's exclusive custody. A plaintiff's pleading burdens are structurally relaxed when the critical evidentiary data identifying the exact mechanics of a systemic, plan-wide fraud is held behind a locked administrative system managed exclusively by the defendants. Courts have frequently recognized that requiring a claimant to plead with highly specific, granular particularity prior to discovery is an insuperable onus when the administrative network operates an automated, opaque claims methodology that shields its internal decision-making files from public view. Because Defendants OPERS and ODC have systematically violated their statutory preservation duties and hold the electronic database logs behind a closed portal, this doctrine completely excuses any lack of baseline data specificity. Plaintiffs' notice-pleading payload provides more than fair warning of the underlying constitutional anchor claims, forcing the file past a motion to dismiss and straight into open discovery. See *Conley v. Gibson*, 355 U.S. 41, 47 (1957).

116

j.  Forcing a solo practitioner and a public school teacher to abandon a mature common-law trial record and enter a highly restrictive state administrative gauntlet—solely because the defendants chose the shredder over compliance—is an existential subversion of the Civil Rules. Because the state compliance network monopolizes the evidence and leverages its public relations infrastructure to protect its financial parasites, the Court of Common Pleas possessed absolute jurisdiction to halt this clinical conversion. The state court's abrupt administrative flight during a live status conference confirms a total breakdown of domestic due process, satisfying the absolute futility exception and demanding immediate, primary federal court intervention.

## VIII. CLAIMS FOR RELIEF

1. Count I: Systemic Due Process and Equal Protection Violations under 42 U.S.C. § 1983:

a.  Plaintiffs Cory A. and Amy N. Haydocy, as a free and independent marital and household estate, plead their damages under 42 U.S.C. § 1983 on a strictly severed, standalone basis, completely independent of the aggregate remedies sought on behalf of the alternative Putative Class and  incorporates all preceding paragraphs by reference.

b.  Standalone Individual Compensatory Damages: The Haydocy marital estate has sustained a profound and ongoing tortious conversion as the direct and proximate consequence of the Defendants' illicit administrative conspiracy to strip citizens of their civil and constitutional rights. This sustained asset deprivation, exceeding 850 consecutive days, encompasses the clinical destruction of market-based investment returns, the suppression of compounding interest within a captured low-yield repository, and severe domestic opportunity costs. Furthermore, this enterprise has inflicted reputational injury and necessitated expansive forensic reconstruction expenses to dismantle the Defendants'

117

bad-faith architecture targeting a household unit with two young children. This clinical litigation track is prosecuted to unyieldingly protect their future; for if the sovereign compact of trust is not vindicated here, no citizen remains secure.

c. Individual Punitive Damages & Fee-Shifting: Because the individual property deprivations targeting the Haydocy household were executed via documented public record spoliation, database scrubbing, and the bad-faith evasion of controlling state jurisprudence (*State ex rel. Davis v. OPERS*), Plaintiffs demand punitive damages in their individual capacities against the executive actors to penalize their malicious institutional concealment. Pursuant to 42 U.S.C. § 1988, the individual Plaintiffs demand the full shifting of all legal fees, administrative disbursements, and expert forensic data appraisal costs, asserting that their accrued individual fees serve as an equitable floor to combat the Defendants' multi-front strategy of economic attrition.

d. Defendants, acting under color of state law, have directly deprived Plaintiff and the proposed Class of their vested property rights in their retirement capital without due process of law. This deprivation was executed by inventing extra-statutory hurdles and fabricating administrative barriers to block mandatory fund transfers, while simultaneously waiving those exact policies for favored beneficiaries when politically or administratively convenient.

e. Defendants have engaged in a clinical, intentional violation of the Equal Protection Clause by subjecting Plaintiff to targeted, disparate treatment relative to all other similarly situated beneficiaries. This bad-faith deployment of an extra-statutory, unpublished protocol was weaponized as a tool of systematic economic attrition to freeze capital and force economic surrender. Under black-letter constitutional law, an equal

118

protection claim is firmly established where an individual is intentionally treated differently from situated peers with no rational administrative basis. See *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).

2. Count II: Civil Conspiracy to Deprive Constitutional Rights under 42 U.S.C. § 1985(3)

    a.  Plaintiffs, on behalf of their marital unit and the proposed Class, incorporate all preceding paragraphs by reference.

    b.  Defendants, through a shared conspiratorial design executed by their executive leadership, compliance networks, and outsourced legal agents, entered into a coordinated, illicit agreement to suppress public data, sanitize official dockets, and systematically purge electronic logs.

    c.  This conspiratorial network operated with the purpose of obstructing justice and preventing Plaintiff and the proposed Class from obtaining legal redress or accessing dispositive evidence of statutory defaults. By actively orchestrating an informational blockade and manipulating physical and electronic court records, Defendants directly deprived the marital unit and the proposed Class of the equal protection of the laws and equal privileges and immunities under the Constitution.

3. Count III: Violations of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962(c)

    a.  Plaintiffs, on behalf of their marital unit and the proposed Class, incorporate all preceding paragraphs by reference. The Racketeering Enterprise's coordinated pattern of mail and wire fraud—executed via the distribution of fraudulent "Lulling Letters" and the certification of a systematically sanitized electronic record to the Supreme Court of Ohio—has inflicted a distinct, measurable economic injury directly upon the business and

119

property of the individual Plaintiffs' marital estate, separate and apart from the plan-wide injuries inflicted upon the alternative Putative Class:

i. The Individual Marital Res (18 U.S.C. § 1964(c)): Plaintiffs Cory A. and Amy N. Haydocy have suffered direct injury to their joint domestic capital pools, representing an explicit, calculated conversion of their private 457(b) deferred compensation under an interest-free administrative float model. Pursuant to the mandatory civil remedies of the RICO Act, the individual Plaintiffs demand the independent trebling of their distinct marital economic losses, alongside the compulsory award of reasonable individual attorneys' fees and litigation expenses.

ii. The Class-Wide Res: Alternately, and tracking a distinct calculation, Plaintiffs seek the aggregate trebling of all captured commercial float reserves illicitly extracted from the tens of thousands of absent public beneficiaries systematically subjected to the un-promulgated "Notary Policy" gauntlet across the State of Ohio. The individual marital estate's entitlement to primary, trebled property restoration stands fully mature and procedurally insulated from any administrative delays, class certification barriers, or aggregate numerosity disputes arising under the secondary class-wide track.

iii. Defendants OPERS and ODC, alongside their outsourced legal compliance networks, technology vendors, and retained outside corporate defense firms, constitute an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4). This Racketeering Enterprise exists as an independent, continuous unit distinct from the individual administrative entities themselves, organized

120

exclusively for the illicit preservation of corporate fund reserves and the absolute insulation of executive malfeasance.

iv. The Racketeering Enterprise's continuous pattern of racketeering activity under 18 U.S.C. § 1962(c) relies upon a hard-coded, recurring *modus operandi*: executing calculated, multi-front mail fraud, wire fraud, and systemic public record spoliation to force swift, non-meritorious judicial dismissals the moment the enterprise is pinned down by an impending discovery or evidentiary crisis.

v. Under *Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639 (2008), first-party reliance is entirely discarded; the enterprise achieves its asset-retention goals by systematically inducing state-court tribunals into entering predetermined, blind rubber-stamps of administrative defaults.This interlocking pattern of defensive containment operates via two identical structural cycles:

    1. The First Cycle (OPERS Containment - June 2025): On June 9, 2025, Plaintiffs filed a comprehensive Evid.R. 201 Consolidated Motion placing uncontradicted evidence of widespread state-level regulatory capture on the record. To insulate Defendant OPERS from answering this forensic payload or submitting to a live evidentiary framework, the Tenth District Court of Appeals executed a lightning-fast summary dismissal on June 10, 2025—less than twenty-four hours later—safely shielding the administrative hub from judicial review.

    2. The Second Cycle (ODC Containment - July 2026): This precise operational methodology was weaponized by the enterprise's adjacent hub on July 1, 2026. Prior to a scheduled 10:00 AM status conference,

121

Plaintiffs served a definitive matrix of formal written questions designed to pierce ODC's procedural evasion and expose their un-rebutted Civil Rule 36 defaults. To prevent ODC from being legally compelled to answer or assert their latent Fifth Amendment problems under cross-examination, a *sua sponte* administrative dismissal was hard-coded into the electronic docket at 9:17 AM.

vi. The July 1, 2026 dismissal entry was structurally engineered for a singular, bad-faith purpose: to permanently immunize Defendant ODC from answering the following dispositive operational inquiries (**Fed. Exh. 57A**):

1. The Notary Deception: Whether ODC textually requires a notarized signature to execute standard, non-discretionary fund rollovers across its published, baseline instrument parameters.

2. The Fiduciary Paradox: Given that ODC has legally and irrevocably admitted on the trial court docket that Plaintiffs' rollover application was fully and properly completed, what precise operational logic justifies the intentional botching of a non-discretionary, purely ministerial fund legal transfer based on an uncodified "Notary Protocol" the agency does not legally require?

3. The Private-Sector Liability Evasion: Whether ODC contends that as a private-sector investment enterprise managing qualified funds under Section 457 of the Internal Revenue Code, it is entirely absolved of its individual liability for common-law breach of contract simply because it operates adjacent to a state administrative unit.

4. The Statutory Duality Threshold: Whether ODC agrees that it stands as a separate, distinct corporate legal entity from OPERS, and that each owes the public beneficiaries an individual, non-delegable fiduciary duty that cannot be mitigated by the adjacent frameworks of the other.

5. The Public Records Suppression: Whether ODC agrees that because its sister agency, OPERS, holds the exclusive digital logs tracking the creation, timing, and enforcement of this exact "Notary Protocol," those backend operational registries constitute discoverable public records under Ohio law.

6. The Numerosity Confession: Whether ODC admits that this un-promulgated notary barrier has been applied to capture the capital of over 10,000 public beneficiaries across the state; the exact empirical metrics of that containment; and the specific identity of the corporate custodian holding the evidence to support it.

7. The Attrition and Data-Wiping Buffer: Whether ODC's bad-faith requests for administrative extensions of time constitute a tacit confession that its technology units require an additional buffer window to locate, alter, or retroactively reconcile the hard-coded database registries the agency has already formally admitted under Rule 36 it failed to retain.

b. When an administrative state apparatus and its private-market co-conspirators systematically deploy lightning-fast, *sua sponte* procedural stays and engineered dismissals to intercept, neutralize, and silence a named client statement of criminal spoliation, the domestic state-court process suffers a terminal structural collapse. The

123

enterprise leverages its informational monopoly to force reviewing courts into issuing blind, predetermined outcomes based on factually sanitized records. This continuous, multi-front manipulation of the judicial machinery to immunize public record destruction and capture an unauthorized commercial float pool completely preembles standard pleading metrics, demanding the immediate invocation of federal equity and the deployment of a Rule 53 Special Master.

c. The Racketeering Enterprise operates with seamless, ongoing continuity; a fraud executed upon one tribunal is instantly deployed as a shield to perpetrate a fraud upon another, satisfying the statutory continuity threshold under 18 U.S.C. § 1962 and inflicting direct, measurable economic injury upon the property of Plaintiff's marital unit and the proposed Class.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully requests that this Court enter judgment in their favor and against Defendants, granting the following remedies:

1. Class Certification and Public Interest Designation: An Order certifying this action as a Federal Class Action under Fed. R. Civ. P. 23, appointing Plaintiff Cory A. Haydocy, Esq., as Class Representative, and, an Order recognizing Plaintiffs' absolute, standalone standing to prosecute these claims to redeem their distinct individual and marital property rights, while simultaneously acting in the capacity of private attorneys general to vindicate the overarching public interest against systemic state agency pension fraud;

2. Immediate Appointment of a Federal Special Master: The immediate appointment of an independent Federal Special Master pursuant to Fed. R. Civ. P. 53, equipped with plenary, non-discretionary authority to deploy independent forensic data engineers to seize, mirror, and

124

reconstruct the database registries, deleted electronic financial transaction logs, and internal communication networks of OPERS and ODC entirely at Defendants' expense. This forensic mandate is demanded as an immediate remedy to protect Plaintiffs' individual evidentiary rights and the integrity of the proposed Class, and must explicitly bypass, supersede, and override any state-court motions to dismiss, administrative stays, or jurisdictional evasions secured via the tactical weaponization of Slip Opinion No. 2026-Ohio-1928;

3. A permanent injunction judicially declaring the extra-statutory, un-promulgated "Notary Protocol" unconstitutional and ordering the immediate operational execution of all non-discretionary, ministerial fund transfers pursuant to the absolute commands of the public beneficiaries—specifically including the immediate restoration of the Plaintiffs' sequestered property and the clinical migration of capital from the OPERS repository into the market-oriented accounts of ODC. ;

4. The mandatory trebling of all economic losses pursuant to 18 U.S.C. § 1964(c), comprehensive compensatory restitution for the continuous conversion of vested capital, and exemplary punitive damages to penalize the defendants' documented pattern of malicious institutional concealment and structural record sanitization, alongside the full shifting of individual legal fees, forensic administrative disbursements, and the exhaustive technical costs for data appraisal and reconstruction, the precise quantum of which shall be liquidated at a formal evidentiary hearing on damages; and

5. Any other relief this Court deems just, equitable, and necessary to restore the rule of law.

 **JURY DEMAND**

125

Plaintiff hereby demands a trial by jury on all counts, claims, and issues so triable of right pursuant to the Seventh Amendment to the United States Constitution and Federal Rule of Civil Procedure 38(b).

Pursuant to Fed. R. Civ. P. 23 and localized practice parameters, Cory A. Haydocy, Esq. enters his formal appearance as an admitted member in good standing of the Bar of the United States District Court for the Southern District of Ohio, appearing uniquely as Counsel for Plaintiffs to protect the fiduciary, administrative, and constitutional property interests of the named marital unit and its beneficiaries.

Respectfully Submitted,

/s/ Cory A. Haydocy, Esq.

CORY A. HAYDOCY, ESQ. (0089694)

HAYDOCY LAW OFFICE LLC

6868 Bowerman St. E

Worthington, Ohio 43085

Telephone: (614) 284-4250

Primary E-Mail: cory@haydocylaw.com

*Counsel for Plaintiffs*

126